**William J. ROCHELLE, Jr., Trustee in Reorganization of Sunset International Petroleum Corporation on his own behalf and as a representative of certain classes, and American Income Life Insurance Company, on its own behalf and as representative of certain classes, Plaintiffs-Appellants,**

v.

**MARINE MIDLAND GRACE TRUST COMPANY OF NEW YORK, being joined as Involuntary Plaintiff,**

v.

**ARTHUR YOUNG & COMPANY et al., Defendants-Appellees.**

**No. 74–1429.**

United States Court of Appeals, Ninth Circuit.

May 10, 1976.

Rehearing Denied June 16, 1976.

---

Richard W. Havel (argued), of Shutan & Trost, Los Angeles, Cal., for plaintiffs-appellants.

Hillel Chodos (argued), Beverly Hills, Cal., for defendants-appellees.

OPINION

Before HUFSTEDLER, WRIGHT and GOODWIN, Circuit Judges.

HUFSTEDLER, Circuit Judge:

This appeal by Rochelle, reorganization trustee of Sunset International Petroleum Corporation ("Sunset") and by American Income Life Insurance Company ("American"), purchaser of a debenture issued by Sunset, against former officers and directors of Sunset and an independent certified public accountant, Arthur Young & Company ("Young")[1] presents a series of questions arising at the intersection of federal securities and bankruptcy law. The district court granted judgment of dismissal of Rochelle's federal securities claims for failure to state a claim for relief and of his common law claims on the ground of lack of jurisdiction. Summary judgment against American was based on the district court's determination that limitations barred American's federal securities suit.

On May 25, 1970, Sunset filed a petition for reorganization under Chapter X of the Bankruptcy Act. Rochelle was appointed trustee. Rochelle brought this action on behalf of Sunset, a class of allegedly defrauded holders of Sunset's debentures, and a class of allegedly defrauded creditors of Sunset. The gist of Rochelle's action was that the defendants, through mismanagement, misrepresentations, and breaches of duties owed to the corporation and to the investing public, grossly overstated the net worth of Sunset and concealed its deteriorating financial condition, causing substantial losses to Sunset, its creditors, and debenture purchasers and holders.

We begin with Sunset's family tree. On April 30, 1966, Sunset, a Delaware corporation, ("Sunset-Del") merged with Sunasco, Inc. (formerly Atlas Credit Corp.). Sunasco formed the present Sunset as a wholly owned subsidiary and caused Sunset-Del's assets to be transferred to Sunset. On January 23, 1968, Commonwealth United Corporation ("CUC") purchased all of Sunset's outstanding stock, and Sunasco acquired certain of Sunset's assets and liabilities.

In the middle and late 1960's Sunset was engaged in substantial real estate development projects in California. According to Rochelle's complaint, the value of Sunset's real estate began to decline precipitously under the impact of a general real estate market downturn in 1965. Sunset's financial statement for the period ending August 31, 1965, certified by Young on November 12, 1965, reported Sunset's net worth to be in excess of $16,000,000. This 1965 statement was included in Sunset's 1965 Annual Report, its proxy statement of March 24, 1966, and two S–1 Registration Statements filed with the Securities and Exchange Commission ("SEC"), effective August 26, 1966. Sunset's September 1966 statement was even rosier. It showed a net worth of more than $18,000,000, with current assets exceeding current liabilities by over $7,500,-000. Sunset's financial statement for the period ending September 30, 1966 was certified by Young as of December 1, 1966. All of the roses wilted in 1967. Assets were written down $20,000,000 as of July 31, 1967, although the write down was not published until December 1967, when it was revealed in proxy materials relating to CUC's acquisition of Sunset. At that time Sunset showed an earned surplus deficit of $3,000,000, and a $19,000,000 provision for loss. The 1967 proxy materials also first disclosed to the public that Sunset had unsuccessfully tried to raise operating capital through its 1966 debenture offering, that Sunset's operating capital was exhausted, that it was unable to meet its real property tax obligations, and that it was in default on purchase money loans secured by its real estate.[2]

---

1. Rochelle also attempted to join Marine Midland Grace Trust Co. ("Marine") as an involuntary plaintiff representing a class of debenture holders. Marine obtained a dismissal. The dismissal of Marine was not appealed.

2. A comparison of some figures on Sunset's balance sheets for the fiscal years ending September 30, 1966 (certified by Young December 1, 1966) and September 30, 1967 (certified on January 1, 1968) illustrates the changes in Sunset's financial picture:

The securities involved in this litigation are some of Sunset's debentures. Sunset, as issuer, received full value on the debentures that it publicly sold. On two occasions Sunset repurchased its debentures at a discount; on a third occasion, on September 8, 1966, it reacquired some of its 6¼ percent debentures with a face value of $100,000 at a price of $100,000, then immediately resold them for $80,000. The only loss that it alleges from its dealings in its own debentures is the $20,000 lost on its resale of the debentures acquired on September 8, 1966. It does not contend that resale was below market value. The cumulative financial effect of its acquisition and resale of its debentures was to reduce Sunset's indebtedness by $805,600 at a cost of $629,200.

Sunset's fall and the present suit take place against a decidedly litigious background. Sunset was undergoing reorganization in a federal district court in Texas, when on September 12, 1972 (more than 2 years after the filing for reorganization) the trustee recommended the present suit to the creditors' committee. The latter split—2 for, 2 against, 1 abstaining—on whether to prosecute this action; there was concern that the suit would deplete the "general expense fund of the estate, but that recovery on any of the class action theories would only go to the benefit of a few creditors." Later in September 1972, Rochelle received permission to file this suit (to avoid statute of limitations cut-offs), but was restricted to filing and serving notice. A Referee and Special Master finally granted Rochelle full authorization to proceed in May 1973; the committee was still split. The dispute on whether or not to sue may account for the lack of participation on the plaintiff's side.

| | 9/30/66 | 9/30/67 |
|---|---|---|
| Total current assets | $47,312,169 | $28,541,219 |
| Total current liabilities | 39,706,119 | 30,752,644 |
| Cash surplus | 14,223,334 | 14,223,334 |
| Earned surplus | 18,070,337 | (3,334,587) |
| Current real estate investment assets | 18,863,823 | 4,307,193 |

### 1. Rochelle's claims on behalf of creditors and debenture purchasers and holders.

We can quickly dispose of the claims that Rochelle purported to assert on behalf of Sunset's creditors and its debenture purchasers. The district court correctly dismissed this phase of the litigation because *Caplin v. Marine Midland Grace Trust Co.* (1972) 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195, held that a reorganization trustee has no standing to maintain the action on the part of any person or entity other than his debtor corporation. (*Accord: Clarke v. Chase National Bank* (2d Cir. 1943) 137 F.2d 797; *Warheit v. Osten* (E.D. Mich. 1973) 57 F.R.D. 629.)

### 2. Rochelle's federal securities law claims on behalf of Sunset.

Rochelle also asserted claims founded on Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78a–hh–1 (1970)) and Rule 10b–5 (17 C.F.R. § 240.10b–5 (1975)) on behalf of Sunset against the named directors and officers of Sunset and against Young.

Rochelle has standing to assert Sunset's Section 10(b) and Rule 10b–5 claims against these defendants. (*Superintendent of Insurance v. Bankers Life & Casualty Co.* (1971) 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128; *Thomas v. Roblin Industries, Inc.* (3d Cir. 1975) 520 F.2d 1393; *Hooper v. Mountain States Securities Corp.* (5th Cir. 1960) 282 F.2d 195.) Debentures, of course, are securities. (Securities Exchange Act of 1934, § 3(a)(10), 15 U.S.C. § 78c(a)(10).) Issuers of other kinds of securities, such as notes (*Rekant v. Desser* (5th Cir. 1970) 425 F.2d 872) and stocks (*Sargent v. Genesco, Inc.* (5th Cir. 1974) 492 F.2d 750; *Dasho v. Susquehanna Corp.* (7th Cir. 1967) 380 F.2d 262; *Ruckle v. Roto American Corp.* (2d Cir. 1964) 339 F.2d 24; *Hooper v. Mountain*

| | 9/30/66 | 9/30/67 |
|---|---|---|
| Current real estate investment liabilities | 15,529,245 | 4,091,332 |
| Net current real estate investment | $ 3,334,587 | $ 215,861 |

Rochelle's argument is in essence that since the 1967 figures were shown by events to be correct, the 1966 figures on current assets and earned surplus must have been inflated.

528

*States Securities Co., supra* ) have been held to be "sellers" within the meaning of the *Birnbaum* rule (*Birnbaum v. Newport Steel Corp.* (2d Cir. 1952) 193 F.2d 461), limiting standing under Section 10(b) and Rule 10b–5 to one who is a purchaser or a seller of securities. (*Birnbaum* was adopted by the Supreme Court in *Blue Chip Stamps v. Manor Drug Stores* (1975) 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539.) A debenture issuer should be treated no differently than an issuer of other kinds of securities for *Birnbaum* purposes. Moreover, Sunset was also both a purchaser of the debentures it reacquired and a seller of the debentures that it reacquired and resold.

The complaint avers adequate facts to show that the 1965 and 1966 financial statements, included in Sunset's Annual Reports, its proxy statements, and its two registration statements were seriously misleading and that the named officers and directors participated in producing these misrepresentations of its financial condition. Young prepared and certified these financial statements.

Rochelle's Section 10(b) and Rule 10b–5 action against the defendants reaches swampy territory when we ask whether the manipulative devices, fraud, and claimed breaches of duty were "in connection with" the purchase or sale of the debentures and whether these activities caused any potentially recoverable damage to Sunset.

Sunset's securities transactions fall into three categories: (1) Its June 1965 acquisition of its 5 percent debentures with a face value of $600,000 for $450,000, and its September 1966 acquisition of similar debentures with a face value of $105,000 for $79,200; (2) its September 1966 acquisition of its 6¼ percent debentures with a face value of $100,000 for $100,000, and the prompt resale of the same debentures for $80,000; (3) the initial issuance of all of its debentures.

■ We agree with the defendants that Sunset cannot base any Section 10(b) or Rule 10b–5 action on the repurchase of its debentures at a discount. Even assuming that the defendants' alleged misconduct

was in connection with these acquisitions, Sunset suffered no loss from them. (*See Foster v. Financial Technology, Inc.* (9th Cir. 1975) 517 F.2d 1068; *Rochez Bros. v. Rhoades* (3rd Cir. 1974) 491 F.2d 402; *Drachman v. Harvey* (2nd Cir. 1972) (*en banc*) 453 F.2d 722.) We also agree that Sunset had no claim for relief based on its resale of its 6¼ percent debentures in September 1966. The complaint contains no averments attempting to tie in Sunset's resale of these debentures to any wrongful acts or breach of duty by these defendants. Thus, if Sunset sustained a loss on the resale, liability for that loss cannot be fastened on them.

We turn to the question of whether any claim for relief has been stated against the defendants under the securities laws based on Sunset's issuance of all of its debentures. Each of the defendants asserts that Sunset cannot seek any relief on this series of transactions because Sunset received the full face amount of all debentures issued, from which it realized and used more than $8,000,000. Rochelle admits that Sunset suffered no loss on the issuance of its debentures. But, he argues, Sunset was nevertheless a loser because the issuance of debentures was part of a larger deceptive scheme by which the defendants created a facade of corporate health when, in fact, Sunset's business was suffering from monetary pernicious anemia. As Rochelle states in his brief, throughout 1965 and 1966, in furtherance of their scheme, the defendants "ignored the disastrous cash flow demands of Sunset's real estate projects. Extensive funds obtained from Sunset's debentures and other lenders were expended to satisfy the negative cash flows of various real estate projects, never to be recouped. These expenditures included a huge corporate overhead, including salaries and accounting fees paid to . . . Young . . ., service and interest payments on the real estate projects, and numerous other expenses incurred in the supposed operation and marketing of Sunset's real estate projects. Simply put, [defendants] purported to maintain a going business when they should have acknowledged a business fail-

ure. And, in doing so, they committed a corporate waste."

Rochelle's theory is thus corporate mismanagement, which he has tried to fit within the roomy language of *Superintendent of Insurance v. Bankers Life and Casualty Co.* *["Bankers Life"]* (1971) 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128. Although Section 10(b) was not meant to cover "internal corporate mismanagement," "[t]he crux of the present case is that Manhattan suffered an injury as a result of deceptive practices touching its sale of securities as an investor." (*Id.* at 12–13, 92 S.Ct. at 169, 30 L.Ed.2d at 134). *Bankers Life* was undoubtedly intended to prevent courts from reading the phrase "in connection with" grudgingly. The Court did not try to describe how close to the securities transaction the mismanagement must be before it is deemed to touch the transaction. No comprehensive definition of these tactile concepts is practicable; rather each alleged scheme must be examined in its own context to determine whether the deception or mismanagement caused injury to persons suing who bought or sold securities and whether the wrongful conduct sullied the "purity of the security transaction and the purity of the trading process." (404 U.S. at 9–10, 92 S.Ct. at 167, 30 L.Ed.2d at 132.) (*See Smallwood v. Pearl Brewing Co.* (5th Cir. 1974) 489 F.2d 579, 592, 594–95.) We assume, *arguendo*, that the alleged mismanagement did taint the purity of the marketing of these debentures and that investors who purchased them thereby suffered injury.[3] Rochelle cannot sue for them because *Caplin v. Marine Midland Grace Trust Co., supra*, disables him from doing so.

 Nor can Rochelle maintain this action on Sunset's behalf. In this case, the "in connection with" requirement bleeds into the requirement that the plaintiff suffer some damages. Sunset could not successfully sue because it lost nothing in its capacity as an investor on the issuance of its debentures.[4] It received full value for the securities; that the directors later frittered away the funds on losing real estate ventures does not mean that Sunset suffered a loss compensable under the federal securities fraud laws. The nexus between the securities transaction and the alleged losses due to mismanagement is too attenuated in this case to use as a predicate for Section 10(b) liability. We thus conclude that the district court correctly dismissed Rochelle's Section 10(b) and Rule 10b–5 claims against all of the defendants.[5]

**3.** *See, e. g., Schlick v. Penn-Dixie Cement Corp.* (2d Cir. 1974) 507 F.2d 374; *In re Penn Central Securities Litigation* (3d Cir. 1974) 494 F.2d 528; *International Controls Corp. v. Vesco* (2d Cir. 1974) 490 F.2d 1334; *Drachman v. Harvey* (2d Cir. 1972) (*en banc*) 453 F.2d 722. Because mismanagement will almost surely affect the value of a corporation's securities, and because internal mismanagement is historically a concern of state law, the expansion of Section 10(b) and Rule 10b–5 liability impinges on state regulation of corporations, (*see Popkin v. Bishop* (2d Cir. 1972) 464 F.2d 714, 720) and may balloon the contours of Section 10(b) far beyond congressional intent. For some of the more recent of the voluminous comment on the mismanagement aspects of the section, *see* Bromberg, "Are There Limits to Rule 10b–5?" 29 Bus.Law., Mar. 1974, at 167, 170; Fleisher, Jr., "Federal Regulation of Internal Corporate Affairs," 29 Bus.Law., Mar. 1974, at 179; Jacobs, "The Role of Securities Exchange Commission Rule 10b–5 in The Regulation of Corporate Mismanagement," 59 Cornell L.Rev. 27 (1973); Comment, "*Schlick v. Penn-Dixie Cement Corp.*: Fraudulent Mismanagement Inde-

pendent of Misrepresentation or Nondisclosure Violates Rule 10b–5," 63 Calif.L.Rev. 563 (1975); Note, "The Controlling Influence Standard in Rule 10b–5 Corporate Mismanagement Cases," 86 Harv.L.Rev. 1074 (1973). *See generally,* 1 A. Bromberg, Securities Law—Fraud—SEC Rule 10b–5, §§ 4.7 (570)–4.7 (571) (1975); Symposium, "An In-Depth Analysis of The Federal and State Roles in Regulating Corporate Management," 31 Bus.Law. 839 (1976).

**4.** We do not adopt Professor Bromberg's test of "in connection with," (1 A. Bromberg, *supra*, § 4.7 (574)(3)) but we do think that the effect on the corporation's "investor interest" is a factor in determining whether Section 10(b) and Rule 10b–5 apply.

**5.** *Ernest & Ernst v. Hochfelder* (1976) —— U.S. ——, 96 S.Ct. 1375, 47 L.Ed.2d 668, came down after this case was submitted. The Court held that a private cause of action for damages under Section 10(b) and Rule 10b–5 will not lie in absence of any allegations of *scienter*. We have no occasion to consider the impact of *Ernst & Ernst* upon Rochelle's federal securi-

**530**

### 3. *Rochelle's common law claims against the defendants.*

█ Rochelle's action, construed as a suit in the nature of a stockholder's derivative suit, based on a variety of common law theories, to recover damages in connection with its debenture transactions looks no better than it did as a Section 10(b), Rule 10b–5 case. Sunset simply did not sustain any loss caused by the defendants' alleged activities in the debenture transactions. That observation does not end the matter because Rochelle also claimed loss, apart from those transactions, caused by the directors' and officers' alleged corporate mismanagement, deceit, negligence, and breach of fiduciary duty and by Young's negligence and breach of its duties based on its employment contract. Even under the relaxed standards of notice pleading (*see Conley v. Gibson* (1957) 355 U.S. 41, 47–48, 78 S.Ct. 99, 102–103, 2 L.Ed.2d 80, 85–86), Rochelle's averments of his common law claims are unsatisfactory. However, we are able to glean that Rochelle contends that Sunset's financial debacle was caused by Young's negligence and by the directors' and officers' management ineptitudes and deceptions about the true financial condition of the corporation. The pleading deficiencies are not sufficiently gross to justify the dismissal.

█ The district court did not address the merits of Rochelle's pleading or the substantive basis for his common law claims because it assumed that federal jurisdiction over these claims rested solely on pendent jurisdiction. If that assumption were correct, the dismissal of these claims was also correct. (*E. g., United Mine Workers v. Gibbs* (1966) 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218. *But see Gem Corrugated Box Corp. v. National Kraft Container Corp.* (2d Cir. 1970) 427 F.2d 499, 500 n.1.) The assumption, however, is not well founded.

█ Rochelle, as a Chapter X reorganization trustee, has an independent source of federal jurisdiction conferred by Section 102 of the Bankruptcy Act. (11 U.S.C. § 502). Although the federal district court, acting as a bankruptcy court, does not have the full range of plenary jurisdiction in or during bankruptcy proceedings (*Williams v. Austrian* (1947) 331 U.S. 642, 662, 67 S.Ct. 1443, 1453, 91 L.Ed. 1718, 1731 (Frankfurter, J., dissenting); *e. g.,* Bankruptcy Act §§ 2(a)(7), 23, 11 U.S.C. §§ 11(a)(7), 46), corporate reorganizations create a different breed of jurisdiction, untrammelled by Section 23 of the Bankruptcy Act.[6] (Collier on Bankruptcy ¶ 3.18, at 542–44 (J. Moore ed. 1975).)

In *Williams v. Austrian, supra,* the trustee of a Virginia corporation undergoing reorganization in the Eastern District of Virginia, sued—in the Southern District of New York—the past and present corporate officers and directors "alleging a conspiracy to misappropriate corporate assets and asking for an accounting and other relief."

---

ties law claims on behalf of Sunset because we have upheld the district court's dismissal of these claims on other grounds.

**6.** Section 2(a)(7) establishes a bankruptcy court's jurisdiction; section 23 limits that jurisdiction. Section 102 removes the strictures on the district court's jurisdiction placed by § 23:

Section 23 reads:

"(a) The United States district courts shall have jurisdiction of all controversies at law and in equity, as distinguished from proceedings under this title, between receivers and trustees as such as adverse claimants, concerning the property acquired or claimed by the receivers or trustees, in the same manner and to the same extent as though such proceedings had not been instituted and such controversies had

been between the bankrupts and such adverse claimants.

"(b) Suits by the receiver and the trustee shall be brought or prosecuted only in the courts where the bankrupt might have brought or prosecuted them if proceedings under this title had not been instituted, unless by consent of the defendant, except as provided in sections 96, 107, and 110 of this title."

Section 102 reads, in relevant part:

"The provisions of Chapters 1 to 7, inclusive, of this title shall . . . apply in proceedings under this Chapter: *Provided, however,* that section 46 [§ 23 of Bankruptcy Act] . . . shall not apply in such proceedings unless an order shall be entered directing that bankruptcy shall be proceeded with pursuant to the provisions of Chapters 1 to 7, inclusive."

(331 U.S. at 645, 67 S.Ct. at 1444, 91 L.Ed. at 1722.) Jurisdiction was predicated on the Bankruptcy Act alone. The district court dismissed for lack of jurisdiction; the Second Circuit reversed on the interpretation of §§ 2a(7), 23 and 102 given here. The Supreme Court affirmed.

In *Williams, supra,* the question was whether all reorganization courts had jurisdiction of plenary actions, free from the Section 23 restrictions. The Court concluded that they did:

> "Congress intended by the elimination of § 23 to establish the jurisdiction of federal courts to hear plenary suits brought by a reorganization trustee, even though diversity or other usual ground for federal jurisdiction is lacking.

> "The decision of the Circuit Court of Appeals is in entire harmony with the foregoing considerations. The language of § 2, in its ordinary sense and no longer limited by § 23, easily comprehends the present type of suit; and so to hold directly and effectively subverses Congressional desires as revealed in the plain policy of Chapter X and in the express elimination of § 23, which has, since its enactment in 1898, been viewed as a sharp restriction upon the jurisdiction theretofore exercised by bankruptcy courts and as a strong preference for state courts." (331 U.S. at 656–58, 67 S.Ct. at 1451, 91 L.Ed. at 1728–29.)

> \* \* \*

> "Our holding is, of course, that Congress in 1938 extended the jurisdiction of the reorganization courts beyond that exercised by ordinary bankruptcy courts." . . . [7]

On remand, Rochelle will have the opportunity to amend his pleadings to cure the deficiencies in stating his common law claims. We have no occasion now to consider any defenses, such as statutes of limitations, that were not considered by the district court.

### 4. *American's claims.*

American sought relief against the defendants based on claimed violations of Section 10(b) and Rule 10b–5 and for common-law fraud and negligence. Unlike Rochelle, American finds no comfort in *Williams v. Austrian.* If American's federal securities claims fail, dismissal of the pendent state claims follows. We therefore begin with American's Section 10(b) and Rule 10b–5 claims.

The district court held that American's federal securities claims were barred by California's fraud statute of limitations, Code of Civil Procedure Section 338(4). All parties agree that the three-year limitations period prescribed by Section 338(4) controls. (*E. g., United California Bank v. Salik* (9th Cir. 1973) 481 F.2d 1012; *Turner v. Lundquist* (9th Cir. 1967) 377 F.2d 44.) The parties also agree that the statute does not commence to run until American discovered the alleged deception about Sunset's financial condition or, in the exercise of reasonable diligence could have discovered it. (*Turner v. Lundquist, supra; Bennett v. Hibernia Bank* (1956) 47 Cal.2d 540, 305 P.2d 20; *National Automobile & Casualty Insurance Co. v. Payne* (1968) 261 Cal.App.2d 403, 67 Cal.Rptr. 784; *Helfer v. Hubert* (1962) 208 Cal.App.2d 22, 24 Cal. Rptr. 900.) American did not have actual knowledge of the deception until November 1969, when it received a proxy statement. The issue on appeal is whether the record before the district court supports that court's decision that American had or is chargeable with notice of sufficient facts about Sunset's financial condition to start the statute's running more than three years before it filed its complaint. We conclude that the record is inadequate to sustain the district court's conclusion.

American bought its debentures on December 1, 1965. It filed this complaint on September 29, 1972. Because more than three years had elapsed from the time the wrong was allegedly perpetrated to the date the complaint was filed, American has

---

7. *Ernst & Ernst v. Hochfelder, supra* note 5, —— U.S. ——, 96 S.Ct. 1375, 47 L.Ed.2d 668, does not purport to affect commonlaw actions for negligence or corporate mismanagement.

the burden of proving that the statute did not run before September 29, 1972. The defendants contend that American failed to overcome the limitations bar because it did not meet California's stringent pleading requirements in avoiding limitations. Apart from that problem, they maintain that knowledge of publicly disclosed information should be imputed to American and that information was enough to have put a diligent person on inquiry more than three years before the complaint was filed.

■ We assume that American did not plead sufficient facts to have withstood a general demurrer if the action had been filed in the California courts. The assumption does not help the defendants because the federal securities claim is a federal claim for relief filed in the federal court. Although we have borrowed the California statute to fill the statutory limitations gap, Congress has never evinced any intention to look to the states for any definition of this federally created right nor has it adopted any of the states' remedies or procedures for vindicating the federal right. (*Tomera v. Galt* (7th Cir. 1975) 511 F.2d 504, 509; *cf. Donovan v. Reinbold* (9th Cir. 1970) 433 F.2d 738, 742.) The sufficiency of the pleading is determined by the Federal Rules of Civil Procedure, implementing the federal policy of notice pleading. (*E. g., Conley v. Gibson* (1957) 355 U.S. 41, 46–47, 78 S.Ct. 99, 102–103, 2 L.Ed.2d 80, 84–85; *Walling v. Beverly Enterprises* (9th Cir. 1973) 476 F.2d 393.) Moreover, this record does not present a pleading question. The motion to dismiss was filed after the presentation of interrogatories and affidavits (F.R.Civ.P. 12(b)), and the motion was treated as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Thus, the issue before us is whether any limitations issue remained to be tried; that is, whether any "genuine issues of material fact" were left outstanding.

■ The material issue of fact is American's knowledge of Sunset's financial condition during the period from the date it bought its debenture to September 29, 1969. The defendants do not contend that the evidence before the district court showed that American had actual knowledge of any of the public disclosures about Sunset's financial condition during this period. Rather, they contend that knowledge of the public disclosures should be imputed to American as a matter of law. Information in public records or published by the news media may be so massive that investors will not be heard to say that they remained ignorant of the financial plight of the corporation involved; the noisy collapse of Equity Funding is an example. But situations will rarely arise when we can say that public notoriety about a corporation's financial condition is sufficiently great to charge an investor with such knowledge as a matter of law. The defendants have pointed to no information published about Sunset in the news media. They have relied on statements in proxy materials sent to Sunset, Sunasco and CUC shareholders and filed with the Securities and Exchange Commission in late 1967 and early 1968. But they have given us no sound reason why debenture holders, and specifically American, should have known about any or all of these items. American was not an unsophisticated investor, but we have nothing in this record tying American's investment expertise to an assumption of knowledge about the contents of these reports. If such facts exist, they can be brought out upon remand.[8]

■ We are mindful that the overriding purpose of Section 10(b) and Rule 10b–5 was to protect the purity of the securities market and that private claims for relief

8. The cases relied on by the defendants are not to the contrary. In all of them either the plaintiff actually knew information that would have put him on notice (*e. g., Hupp v. Gray* (7th Cir. 1974) 500 F.2d 993; *de Haas v. Empire Petroleum Co.* (10th Cir. 1970) 435 F.2d 1223; *Turner v. Lundquist* (9th Cir. 1967) 377 F.2d 44; *Colo-nial Realty Corp. v. Brunswick Corp.* (S.D.N.Y. 1971) 337 F.Supp. 546) or had a statutory duty to know information which was available (*National Automobile & Casualty Co. v. Payne* (1968) 261 Cal.App.2d 403, 67 Cal.Rptr. 784; *see also Holdsworth v. Strong* (10th Cir. 1976) [slip op'n].

thereunder are a means to that end. We would impair the larger purpose if we were to expand the concept of constructive notice to defeat such claims. We also observe that in thus confining constructive notice, we are following California's policy under which the public interest in preventing and punishing deceit and fraud is deemed to outweigh the public interest in preventing the assertion of stale claims. (*E. g., Seeger v. Odell* (1941) 18 Cal.2d 409, 115 P.2d 977; *cf. Wilbur v. Wilson* (1960) 179 Cal.App.2d 314, 3 Cal.Rptr. 770.)

To the extent that American's complaint purports to seek relief against any and all of the defendants for negligence, as distinguished from fraud, complete with *scienter*, no claim for relief has been or can be stated under the federal securities law. (*Ernst & Ernst v. Hochfelder, supra* note 5, —— U.S. ——, 96 S.Ct. 1375, 47 L.Ed.2d 668.) We do not attempt further to parse the pleadings because neither the district court nor the parties had reason to anticipate that decision.

Finally, the district court correctly dismissed those claims for relief for common law negligence because California's two-year statute had unmistakably run. (Cal.Code Civ.Proc. § 339.) Sunset went into bankruptcy on May 25, 1970, more than two years before this complaint was filed.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with the views herein expressed. Each party shall bear his or its own costs on appeal.