**James P. JOHNSON, as Equity Receiver for the Chilcott Futures Fund, Plaintiff,**

v.

**Thomas D. CHILCOTT, et al., Defendants.**

**Civ. A. No. 82–C–889.**

United States District Court, D. Colorado.

July 10, 1984.

Kenneth C. Groves, Denver, Colo., Rodney R. Patula, Pryor, Carney & Johnson, Englewood, Colo., Arthur E. March, Jr., March, March, Myatt & Korb, Fort Collins, Colo., for plaintiff.

Richard P. Slivka, Bosworth & Slivka, P.C., Denver, Colo., Perry L. Taylor, Jr., Kattan, Muchin, Zavis, Pearl & Haller, Chicago, Ill., Charles F. Brega, Roath & Brega, Denver, Colo., John R. Dutt, Wilkie, Farr & Gallagher, New York City, John S. Lutz, David G. Palmer, Holland & Hart, David M. Ebel, Michael Gallagher, Richard P. Holme, Davis Graham & Stubbs, Denver, Colo., for defendants.

Sid Anders pro se.

Thomas Chilcott, pro se.

## ORDER

CARRIGAN, District Judge.

Defendants Shearson Lehman/American Express, Inc. ("Shearson"), Donald Cunningham and Boettcher & Company ("Boettcher") have filed motions to dismiss part or all of the plaintiff's second amended complaint. The issues have been thoroughly briefed and argued.

### I. *General Background.*

From the mid-1970's through June 1981, Thomas D. Chilcott obtained tens of millions of dollars from hundreds of investors by representing that the funds were being invested in a highly profitable commodities pool. Chilcott further represented that his trading was restricted to securities, later to securities and commodity futures, and finally to commodity futures only.

A federal investigation begun in June 1981 revealed that Chilcott had not made the promised investments, nor had he earned the profits he had reported. Chilcott's actual investments included partnerships and joint ventures for trading in securities, investment contracts, commodity futures contracts, real estate, race horses, dental clinics, oil and gas leases, computer software businesses, advertising, and various other enterprises. The investigation found that he had lost most of the investors' money.

Chilcott's devices took the form of a so-called "ponzi scheme." Through false and misleading statements and omissions concerning the past performance and current profitability of the Chilcott Futures Fund ("the fund"), investors were induced to part with their money. From time to time, some investors purchased additional interests in the fund, or withdrew some or all of their investments or shares of "profits." Since the fund actually had no profits, it had to cover these withdrawals while continuing to lose money. Chilcott, therefore, had to obtain ever-increasing sources of new money to pay those who wanted to "cash-out." These payments were essential to maintain investor confidence, and Chilcott continued misrepresenting the facts in order to keep the fund alive with continual infusions of new capital.

After Chilcott's fraudulent scheme collapsed, the Commodity Futures Trading Commission (CFTC) sued in this court seeking appointment of an equity receiver to administer Chilcott's assets. *CFTC v. Chilcott Commodities Corp., et al.,* (Civil Action No. 81–F–999). In that action Chief Judge Finesilver appointed James P. Johnson as receiver. Johnson, in his capacity as receiver, instituted the present action.

In this case, the receiver sues on behalf of the "Chilcott Futures Fund." An evidentiary hearing is scheduled July 16, 1984 to determine whether the named fund actually exists as an entity with standing and capacity to sue. For purposes of the instant motions to dismiss only, the defendants have conceded that the fund is, as alleged, an investment entity with a legal status separate from its investors.

Six defendants have been named in the complaint. The first, Chilcott, was convicted of wire fraud and is in prison. He has been served all pleadings and motions, but has not appeared by counsel or otherwise. In any event, he has already surrendered his assets to the receiver.

Defendants Shearson and Boettcher are brokerage firms through whom Chilcott traded commodities during his fraudulent activity. The three remaining individual defendants were at various times employed by Shearson or Boettcher.

The complaint contains seven claims for relief. The first three are federal claims based on the Commodities Exchange Act and the Securities Exchange Act of 1934. The receiver alleges that Chilcott directly violated, and that the remaining defendants aided and abetted him in violating, these federal anti-fraud provisions. The remaining claims, all state law claims, are for common law fraud, conversion, negligence, negligent supervision, and breaches of fiduciary duties. It is undisputed for purposes of this motion that Chilcott defrauded investors through representations and omissions, and that he misappropriated much of the money entrusted to him.

## II. *Aiding and Abetting Liability Under the Commodity Exchange Act.*

■ The first issue raised by the defendants' motions to dismiss is whether there existed at the times in question a private right of action for aiding and abetting violations of the Commodity Exchange Act (CEA). At the June 22, 1984 hearing on these motions, I held that the plain language of CEA § 13c(a), in the form in which it existed when the facts of this case occurred, limits remedies for aiding and abetting to administrative proceedings.[1] Section 13c(a) then provided:

"Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this Act, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this Act or any of such rules, regula-

tions, or orders *may be held responsible in administrative proceedings under this Act for such violation as a principal.*" (Emphasis added)

Plaintiff argues, however, that the first and second claims, the federal "aiding and abetting" claims, are not premised on § 13c(a) but are founded on private rights of action implied by CEA §§ 4b and 4o. Section 4b makes it unlawful for any person "in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery . . .

(A) to cheat or defraud . . . [another] person;

(B) willfully to make or cause to be made to such other person any false report or statement thereof . . .;

(C) willfully to deceive or attempt to deceive such other person . . . ."

Section 4o makes it "unlawful for any commodity trading advisor or commodity pool operator . . .

(A) to employ any device, scheme or artifice to defraud any client or participant or prospective client or participant; or

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant."

Plaintiff claims that Chilcott's acts violated these sections and that the defendants aided and abetted his violations. In order to have a remedy, the plaintiff must assert that a private right of action for aiding and abetting is implied by §§ 4b and 4o, and he has so asserted.

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) is the seminal case on implied private judicial remedies under the CEA. There the Supreme Court

---

1. By amendment effective January 11, 1983, Congress eliminated the administrative remedy limitation. The normal rule of statutory construction requires that the amendment, like other statutory amendments, be given effect pro-

spectively. *See Jensen v. United States,* 662 F.2d 664, 667 (10th Cir.1981) ("Normally, retroactive application of legislative acts is impermissible absent a clear indication of congressional intent.")

clearly reaffirmed adherence to the approach taken in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) to determine whether a statute implies a private remedy. Moreover the Court there reiterated that discerning Congressional intent is the key to determining whether a private right of action is implied. The *Curran* Court declared that "[i]n determining whether a private cause of action is implicit in a federal statutory scheme *when the statute by its terms is silent on that issue,* the initial focus must be on the state of the law at the time the legislation was enacted." 456 U.S. at 378, 102 S.Ct. at 1839. (Emphasis added).

The issue in *Curran* was whether there existed a private right of action for *direct* violations of the CEA. When Congress amended the CEA in 1974, keeping intact the provisions courts had interpreted as implying private judicial remedies, and not adding language either affirming or derogating judicially inferred remedies, Congress was presumed to have acted with knowledge of then existing case law. Said the court: "[T]he fact that a comprehensive reexamination and significant amendment of the CEA left intact the statutory provisions under which the federal courts had implied a cause of action is itself evidence that Congress affirmatively intended to preserve that remedy." *Curran,* 456 U.S. at 381–82, 102 S.Ct. at 1840–41.

In contrast to the determinative factor in *Curran, i.e.,* the CEA's silence on private judicial remedies for *direct* violations, stands the obvious fact that the act is not silent on *aiding and abetting* liability. In § 13c(a) Congress clearly indicated its intent that there be no private judicial remedy for aiding and abetting violations of *any* CEA provision. Section 13c(a) states that "[a]ny person who ... aids ... [and] abets ... a violation of any of the provisions of *this Act* ... may be responsible in administrative proceedings ... as a principal." (Emphasis added).

Again in contrast to *Curran,* no federal court, before the 1974 amendments, had ever found a private judicial remedy for aiding and abetting liability. Despite the state of the law in 1974, Congress chose *not* to remove the administrative remedy language from § 13c(a). Not surprisingly, no court after the 1974 amendments found a private judicial remedy for aiding and abetting liability. Only since 1983, when Congress removed the express limitation of remedy, has there existed a private judicial remedy for aiding and abetting CEA violations.[2] The inquiry whether Congress intended to imply, in §§ 4b and 4o, private rights of action for aiding and abetting is abbreviated by the express limitation of remedy found in § 13c(a).

> "[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it. 'When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.'" *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19–20, 100 S.Ct. 242, 246–47, 62 L.Ed.2d 146 (1979); *Strax v. Commodity Exchange, Inc.,* 524 F.Supp. 936, 944 (S.D.N.Y.1981).

To infer a private remedy for aiding and abetting in the face of the § 13c(a) limitation would require evading rather than following the intent of Congress.

I conclude that the plaintiff has no private judicial remedy for aiding and abetting violations of the CEA.

### III. *Alleging Fraud Under the Commodity Exchange Act and the Securities Exchange Act of 1934.*

In 1972, the Supreme Court in *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) decided that a receiver for an entity does not have standing to assert claims belonging to investors in the entity. The Tenth Circuit Court of Appeals relied on *Caplin* in *CFTC v. Chilcott Portfolio*

---

**2.** Section 13c(a), as amended January 11, 1983 by P.L. 97–444, Title II, § 230, 96 Stat. 2319, now states that "[a]ny person who ... aids ...

[and] abets ... a violation of any of the provisions of this Act ... may be responsible for such violation as a principal."

*Management, Inc.,* 713 F.2d 1477 (10th Cir. 1983). As a result, the plaintiff receiver in the instant case amended his complaint to allege only fraud committed against the entity, i.e. the fund. The parties agree that the receiver has no standing to assert "inducement to invest" claims, and that at most he may assert claims of fraud committed against the fund.

A receiver seeking to state a fraud claim on behalf of an entity must allege that the fund itself, as distinguished from the investors, was damaged by the claimed misrepresentations and omissions. In the wake of *Caplin,* court after court has grappled with the issue whether an entity in the position of the Chilcott "fund" incurs damages, or whether only the investors are damaged.

In *Rochelle v. Marine Midland Grace Trust Co.,* 535 F.2d 523 (9th Cir.1976) the plaintiff Rochelle was the reorganization trustee for Sunset International Petroleum Corporation. Suing on behalf of both the investors in Sunset and Sunset itself, the trustee claimed fraud in the issuance of financial statements which had exaggerated Sunset's net worth while failing to disclose its deteriorating financial condition. Adhering to *Caplin,* the court held that the trustee had no standing to assert claims on behalf of the investors. *Rochelle,* 535 F.2d at 527. The court also dismissed the fraud claims asserted by the trustee on behalf of the entity, holding that Sunset had not been damaged by the misrepresentations and omissions, but instead had benefitted.

> "Sunset could not successfully sue for damages because it lost nothing in its capacity as an investor on the issuance of its debentures. It received full value for the securities; that the directors later frittered away the funds on losing real estate ventures does not mean that Sunset suffered a loss compensable under the federal securities laws." *Rochelle,* 535 F.2d at 529.

The same result was reached in *Canut v. Lyons,* 450 F.Supp. 26 (C.D.Cal.1977)—a case remarkably similar to the instant case. In *Canut* a federal conservator was appointed to represent business entities engaged in a ponzi scheme created by one David Lyons. Lyons had organized Lyons Oil Company and its subsidiary Road Oil Sales. Under limited partnership agreements, individual investors were to be limited partners, and Road Oil Sales the general partner, in exploring for oil and drilling oil wells. In reality, no wells were drilled. Instead, David Lyons, as president and sole owner of Lyons Oil, used the money in a classic ponzi scheme. Early investors were paid dividends from funds contributed by later investors, thus perpetuating the scheme by selling more limited partnership interests and infusing more money into Lyons Oil Company.

The *Canut* court held that the conservator had no standing to sue alleged aiders and abettors of the sales of partnership interests because Lyons Oil Company, on whose behalf the conservator was suing, was the entity that had benefitted from the ponzi scheme. It had been the beneficiary rather than the victim.

> "In this case, the corporation does not have an action under Section 17, Section 10, or Rule 10b–5, because it has suffered no damages. On the contrary, Lyons Oil was the beneficiary of the alleged fraud perpetrated here .... Lyons Oil, rather than being injured has actually benefitted from the alleged fraudulent devices, because the moneys involved went to Lyons Oil." *Canut,* 450 F.Supp. at 29.

Although worthless partnership interests had been sold, the Lyons Oil Company benefitted because it received assets for its shares as a result of the fraud.

As this more or less standard fact pattern has reappeared in the cases, receivers often have made an attenuated "but for" causation argument to sidestep the failed logic of relying on misrepresentations to investors as the basis for recovering on behalf of an entity which actually benefitted from those misrepresentations. In the typical case, the receiver has argued that "but for" the false representations, there would have been less investment in the

entity, that "but for" the additional investment the entity would have shut down earlier, and that "but for" the continuation of the entity, fewer assets would have been dissipated from it.

The court in *In re Investors Funding Corp.*, 523 F.Supp. 533 (S.D.N.Y.1980) held that this series of "but fors" failed to bridge the proximate cause gap. I agree. The "but for" causation chain fails as a matter of law to establish a proximate causal link between the misrepresentations to investors and any losses to the corporate entity. 523 F.Supp. at 540.

Receivers in these cases, as in the case before me, have relied on misrepresentations to investors—misrepresentations that the receivers have no standing to assert and which did not harm but benefitted the entities for whom they have sued. The receiver in the instant case argues that these misrepresentations are alleged in his complaint only to explain Chilcott's overall scheme. But when one looks beyond these misrepresentations and seeks to identify specific misrepresentations made to *the fund*, it is clear that there are no such misrepresentations to identify. The misrepresentations are one and the same, running from Chilcott to the investors to induce them to invest, with the fund benefitting by each investment.

Two recent cases alleging the standard fact pattern were brought by a receiver/conservator for companies called the "Flowerland Entities." The receiver claimed losses resulting from misrepresentations in offering circulars distributed to investors incident to Flowerland's issuance of securities. In *Baker v. Adler*, [Current] CCH Fed.Sec.L.Rep. para. 99,518 (D.D.C. 1982) the court held:

"[Defendants] assert that plaintiff must have suffered some 'loss' which is traceable in some 'reasonably direct or proximate' manner to the alleged misrepresentation made by defendant. Because plaintiff represents the very entities involved in the claimed fraud on the investors, these entities cannot be said to have suffered a 'loss' by the sale of securities involved where they received value for the securities. Again, we agree and this count must accordingly be dismissed." *Baker v. Adler*, at 96,981.

Similarly, in *Baker v. Heller*, 571 F.Supp. 419 (S.D.Fla.1983), the court declared: "The plaintiff in this cause also represents the entities which sold the securities and received the benefits from any alleged violations of the federal securities laws and likewise lacks standing to assert a claim for violation of §§ 17(a) and 10(b), or Rule 10b–5." *Baker v. Heller*, 571 F.Supp. at 419.

In the latest case, *Glusbund v. Fittin Cunningham Lauzon, Inc.*, [Current] CCH Fed.Sec.L.Rep. para. 99,706 (S.D.N.Y. 1984), claims were brought on behalf of an entity alleging fraud arising out of misrepresentations made to investors to induce them to invest in the entity. The court dismissed the claims stating:

"Although plaintiff's amended complaint may contain some sufficient allegations of fraud, those allegations refer to frauds perpetrated against the limited partners of Associates, rather than against the partnership itself." *Glusbund*, at 97,835.

The receiver here argues that all of these cases are distinguishable because he is not suing for any alleged damage suffered in connection with the fund's sale of assets or securities in itself, but rather is suing for looting of the fund's assets. The receiver's effort to distinguish these cases from the facts at hand is not compelling. In all of the cases above discussed, the receivers attempted to pin other losses suffered by the entity on misrepresentations by which the entity had raised money. But in all instances, the courts held that the misrepresentations were the means by which the entities gained.

I find nothing to distinguish the line of cases discussed from the matter at hand. Chilcott's misrepresentations and omissions, as alleged by the receiver, included issuing false statements concerning the fund's cumulative gain, issuing false periodic reports on trading performance, con-

cealing the fund's deteriorating financial condition, omitting to disclose that he was making investments not permitted by the fund's investment agreements and omitting to disclose that he was using fund assets to pay himself commissions based on non-existent profits. These misrepresentations and omissions are precisely what fueled continued investor contributions.

Certainly there was dissipation of assets for which the receiver may sue. Just as a ponzi scheme is characterized by fraudulent investment, so is dissipation of assets a necessary element. The problem, however, is that the receiver purports to assert claims for fraudulent dissipation of assets on behalf of the fund, but looks for the element of deception in misrepresentations made to investors to induce them to invest. The beneficiary of that deception was the fund itself.

This is not to say that a receiver could never assert a claim for dissipation of assets. Just such a claim was made in *Hooper v. Mountain State Securities Corp.*, 282 F.2d 195 (5th Cir.1960). In that case the corporation which the receiver represented was induced by the defendant's fraudulent representations to sell its stock in return for spurious assets. The court held that the corporation did not benefit, but was instead injured because its assets were virtually given away.

The same is not true here. Chilcott's fraud is what attracted money to the fund. The fund could not have continued to exist but for Chilcott's fraud. The dissipation which occurred can more properly be remedied by the state law claims for conversion, negligence, and breach of fiduciary duty— than by federal anti-fraud claims. This holding that the fund can show no damages under the federal securities laws certainly does not diminish in any way the rights of investors to pursue their federal anti-fraud claims for any damages they may have incurred.

IV. *State Law Claims.*

■ After a court has appointed a receiver,

"then any suit by the receiver in such court concerning the conserving of the res or winding up of business ... must be regarded as ancillary or auxiliary to the main suit and *cognizable* in this federal court regardless either of the citizenship of the parties or of the amount involved in the controversy." (Emphasis added) *Clark, Law of Receivers*, Vol. 2, § 581, p. 948 (1959); *See also* 7 *Moore, Moore's Federal Practice*, para. 66,07[3], p. 1938–39 (2d ed. 1975).

Since the receiver has sued in the district of his appointment, his claims require no independent jurisdictional base. It does not necessarily follow, however, that jurisdiction *must* be exercised. Such claims are merely *cognizable* in this court; jurisdiction is discretionary not mandatory. *White v. Ewing*, 159 U.S. 36, 15 S.Ct. 1018, 40 L.Ed. 67 (1895); *Canut v. Lyons*, 450 F.Supp. 26, 30 (C.D.Calif.1977).

*Canut* pointed out that cases involving the right of a federally appointed equity receiver to exercise removal jurisdiction also indicate that a federal court's jurisdiction over a receiver's suits is ancillary, not original. *Canut*, 450 F.Supp. at 31, citing *Gay v. Ruff*, 292 U.S. 25, 54 S.Ct. 608, 78 L.Ed. 1099 (1934) and *Gableman v. Peoria, Decatur & Evansville Ry. Co.*, 179 U.S. 335, 21 S.Ct. 171, 45 L.Ed. 220 (1900). In *Gableman*, the receiver of a railroad company was sued in state court for negligence. The Supreme Court held that the federal court to which the case had been removed was without jurisdiction:

"The question is whether the bare fact that the appointment of this receiver was by a Federal Court makes all actions against him cases arising under the Constitution or laws of the United States, notwithstanding [that] he was appointed under the general equity powers of courts of chancery, and not under any provision of that Constitution or of those laws; and that his liability depends on general law, and his defense does not rest on any act of Congress. We are of opinion that this question must be an-

swered in the negative...." *Gableman,* 179 U.S. at 340, 21 S.Ct. at 173.

The parties have not had an opportunity to brief or argue the issue whether this court should retain jurisdiction of the state law claims. Where discretion is involved, considerations such as judicial economy, convenience of parties and witnesses, and fundamental fairness may be considered. If there are factors in this case which would cause substantial injustice to any party in the event I should decline jurisdiction, those factors should be argued. A time for that argument will be set on an expedited basis.

Accordingly,

IT IS ORDERED that the first claim under § 4b of the Commodities Exchange Act, the second claim under § 4o of the Commodities Exchange Act and the third claim under § 10(b) of the Securities Exchange Act and Rule 10b–5 are dismissed. The court, *sua sponte,* dismisses these federal claims against those defendants named in this action who have not joined in the motions.