523 F.Supp. 533 (1980)
In re INVESTORS FUNDING CORPORATION OF NEW YORK SECURITIES LITIGATION.
James BLOOR, as Trustee Pursuant to Chapter X of Title 11 of the United States Code of the Estates of Investors Funding Corporation of New York, etc., Plaintiff,
v.
Jerome DANSKER, et al., Defendants.
MDL No. 290 (WCC), No. 76 Civ. 4679 (WCC).
United States District Court, S. D. New York.
November 19, 1980.
*534 *535 Anderson, Russell, Kill & Olick, P. C., New York City, for plaintiff, James Bloor, as Trustee; Eugene R. Anderson, John H. Gross, Nicholas J. Zoogman, New York City, of counsel.
Cahill, Gordon & Reindel, New York City, for defendants, Peat, Marwick, Mitchell & Co. and Jerome Lowengrub; R. Anthony Zeiger, John H. de Boisblanc, George Wailand, Kenneth J. Berman and Leonard P. Novello, Associate Gen. Counsel, New York City, of counsel.
Proskauer, Rose, Goetz & Mendelsohn, New York City, for defendants, Ernst & Whinney, as successor to S. D. Leidesdorf & Co., and Robert Saltzman; David I. Goldblatt, *536 David Aronson, Gary B. Bettman, New York City, of counsel.

OPINION AND ORDER
CONNER, District Judge:
This action is before the Court on objections filed by defendants Peat, Marwick, Mitchell & Co. and Jerome Lowengrub, a partner in Peat, Marwick, Mitchell & Co. purportedly named as representative of a defendant class of all Peat Marwick partners (collectively "PMM"), pursuant to 28 U.S.C. § 636(b)(1), to the Recommended Decision of Magistrate Harold J. Raby, Report No. 19 submitted April 20, 1979, on PMM's motion for partial judgment of dismissal on the pleadings or for partial summary judgment.
Plaintiff James Bloor ("Trustee"), Chapter X Trustee for Investors Funding Corporation of New York ("IFC"), has instituted this suit against a multitude of defendants alleging fraud in connection with the insolvency of IFC. The complaint alleges that PMM was retained by IFC to audit certain of its books and report upon its financial statements for the years 1968-1971, and asserts the following claims against PMM which are at issue in this motion:
"(a) violations of Sections 10(b), 20, 18 and 14 of the Securities Exchange Act of 1934 (the "1934 Act") (15 U.S.C. §§ 78j(b); 78t; 78r; and 78n) (fourth through sixth claims);
"(b) state law claims for violations of Sections 352-c and 339-a of the New York General Business Law (seventh and eighth claims);
"(c) a state law claim of aiding and abetting common law fraud (third claim);
"(d) a state law claim for breach of contract in performing accounting services (nineteenth claim);
"(e) state law claims for negligence in performing such services (twentieth and twenty-second claims); and
"(f) a bankruptcy claim for fraudulent transfer (twenty-seventh claim)."
In his Report 19 ("Report"), Magistrate Raby recommends the granting of PMM's motion as to the Trustee's Sixth Claim against PMM, alleging violation of Section 14 of the 1934 Act. The Trustee has not objected to this recommendation. This portion of the Report is accordingly approved.
The Report also recommends denial of PMM's motion as to the Trustee's Third, Fourth, Fifth, Seventh, Eighth, Nineteenth, Twentieth, Twenty-Second and Twenty-Seventh Claims. PMM has objected to these recommendations, and accordingly the Court must make a de novo determination as to these issues, 28 U.S.C. § 636(b).

Background
The principal actors in the drama described in the Trustee's complaint are Jerome, Norman and Raphael Dansker ("Danskers"), "the principal officers, controlling directors, controlling stockholders and the dominant force of IFC until some time prior to October 21, 1974" (105.)[1] IFC allegedly suffered massive damages at the direction of the Danskers, in part as a result of certain management decisions and in part as a result of transactions by which the Danskers misappropriated IFC funds for the personal benefit of themselves and others (103 et passim.). Characterizing these actions by the Danskers as "the Fraud" (100), the Trustee asserts that "[a]s the Fraud progressed, larger and larger amounts of money were required and were obtained in order (i) to cover up past fraudulent activities, management malfeasance, and business reverses, (ii) to give IFC the false and misleading appearance of legitimacy and success and (iii) to continue the Fraud" (104). Consequently the Fraud is said to have included multiple secret and sham transactions resulting in artificial profits and concealed losses (101). On the basis of this false image of financial health, the Danskers were allegedly able to obtain for IFC huge quantities of funds from creditors, debenture holders, stockholders and other sources (102), monies purportedly utilized in perpetuating and concealing "the Fraud."
The alleged role of PMM in this scenario consisted of its certification of IFC financial *537 statements which, according to the Trustee, materially overstated the income and assets of IFC while materially understating its losses and liabilities (223). PMM is alleged to have breached its contractual obligation to render accounting services in a "thorough, skillful and diligent manner" (228); to have failed "to employ generally accepted auditing standards" (228); to have performed "in reckless disregard of the facts, and in a reckless, careless, unskilled and grossly negligent manner" (229); and to have failed to discover IFC's true financial condition and adequately to prepare and examine IFC's financial statements (229). The complaint concludes that since such inaccurate financial statements were necessary to the continued ability of IFC to obtain funds, and further, since the acquisition of funds by IFC was necessary to the continued vitality of "the Fraud," but for PMM's failure to perform properly its accounting services "the Fraud" would not have continued throughout PMM's tenure as IFC's independent auditor (230). The complaint contains specific allegations that inaccurate financial statements certified by PMM were included in prospectuses and other SEC filings in connection with the issuance and sale of securities (236), and that such sales "were an integral part of the Fraud since they generated the money which was necessary to perpetrate and maintain the Fraud" (234).

Discussion

I. GENERAL ISSUES
Among the many arguments advanced by PMM in support of its motion, two legal issues have repeating significance, and will accordingly be addressed here preliminarily to a discussion of the Trustee's nine specific claims for relief. These two general issues are (a) whether IFC suffered damages in connection with the purchase or sale of securities and, if so, whether the alleged conduct of PMM proximately caused such damages, and (b) whether the conduct and knowledge of the Danskers and other IFC management may be imputed to IFC.

A. The "In Connection With" and Causation Requirements

The thrust of the Trustee's allegations regarding securities transactions is that the Danskers, as a result of IFC's artificial appearance of financial health, were able to induce investors to purchase IFC's securities at prices in excess of their true value. If this is so, argues PMM, then IFC received more than fair value in its securities transactions. Any damage suffered by IFC,[2] PMM's argument continues, resulted from subsequent misappropriations or investment misjudgments as to the proceeds from such securities transactions, and such damages were thus not suffered in connection with the purchase or sale of a security, the requisite element of a private action for damages under Sections 10(b) and 18, see Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).[3]
The Trustee in response has relied upon the decision of the Supreme Court in Supt. *538 of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). In Bankers Life, the plaintiff brought suit under Section 17(a) of the Securities Act of 1933 (the "1933 Act") and Section 10(b) of the 1934 Act on behalf of Manhattan Casualty Co. Manhattan was caused by one of its officers to sell its United States Treasury bonds and to deposit the proceeds from such sale in an account at Irving Trust, against which account the officer and his outside collaborators had fraudulently drawn a check for their personal use in purchasing stock of Manhattan. Despite the fact that "the full market price was paid for those bonds," id. at 9, 92 S.Ct. at 167, the Court concluded that fraud was committed in connection with the sale of these Treasury bonds because "the seller was duped into believing that it, the seller, would receive the proceeds." Id. The Court concluded:
"The crux of the present case is that Manhattan suffered an injury as a result of deceptive practices touching its sale of securities as an investor."

Id. at 12-13, 92 S.Ct. at 169.
The Trustee contends that Bankers Life broadly establishes that transactions "touching" the purchase or sale of securities fall within the ambit of the federal securities laws. Specifically, the Trustee construes Bankers Life as holding that damages suffered by a corporation as a result of the misappropriation or misuse of its funds can be the basis for a securities laws claim if: (1) the funds had been acquired by the corporation in exchange for securities, and (2) the sale of the securities by the corporation and the misdirection of the receipts therefor were both accomplished as parts of an integral scheme to defraud the corporation.
PMM has offered an alternative construction of Bankers Life. According to PMM, the Court found the claim in Bankers Life to be cognizable under the federal securities laws because the sale of the Treasury bonds was a necessary and inseparable element of the arrangement by which Manhattan was defrauded, i. e., the deposit of the proceeds in an account against which defendants had that same day drawn a check in the same amount. Critical to PMM's interpretation of Bankers Life is the Court's statement that Manhattan "was duped into believing that it ... would receive the proceeds." 404 U.S. at 9, 92 S.Ct. at 167. PMM argues that Bankers Life is not applicable to a situation where the securities transaction and the misdirection of the proceeds are conceptually separate, i. e., where the corporation does receive the proceeds from the sale of securities but is subsequently defrauded of the benefits of such consideration. Otherwise, suggests PMM, every state law action for mismanagement or theft of corporate funds will be converted into a federal securities laws claim if the funds were originally obtained in a prior securities transaction.
In support of its position, PMM relies principally upon Rochelle v. Marine Midland Grace Trust Co., 535 F.2d 523 (9th Cir. 1976). In Rochelle, the Ninth Circuit held that a bankruptcy trustee could not maintain a Section 10(b) action against the bankrupt corporation's former officers and its independent accountants where plaintiff admitted that full value was received by the bankrupt on the issuance of its debentures, but complained that the proceeds were "frittered away" by expenditures on losing real estate ventures, as part of a scheme to create "a facade of corporate health." Id. at 528-29. The court distinguished Bankers Life on the ground that "[t]he nexus between the securities transaction and the alleged losses due to mismanagement is too attenuated in this case to use as a predicate for Section 10(b) liability." Id. at 529.
In reply, the Trustee's position is that his allegations are not merely of corporate mismanagement of the proceeds from securities sales, but are rather of a continuing fraud with the objective, at least in part, of looting IFC of such funds, and thus that the instant case is more akin to Bankers Life *539 than to Rochelle. Alternatively, the Trustee argues that the cases are inconsistent and that the superior authority of Bankers Life must control.
Without adopting PMM's closely circumscribed reading of Bankers Life, the Court is persuaded that Rochelle is both correct and consistent with Bankers Life, and that for the reasons stated in Rochelle a portion of the damage claim alleged by the Trustee does not state a claim against PMM under the federal securities laws because the damages were not incurred in connection with the purchase or sale of a security. Specifically, any damage suffered by IFC as a result of mismanagement of the proceeds of sales of securities cannot be the basis of a federal securities laws claim against PMM.
Since IFC, by the Trustee's own allegations, received more than fair value in exchange for its debentures and other securities, it was not damaged until the proceeds from such sales were subsequently misused. Such damages to IFC occurred either because (1) the Danskers looted IFC of such monies, or (2) such monies were poured into imprudent ventures in order to maintain the facade of IFC's financial well-being. The latter category is precisely the basis of the claim advanced and rejected in Rochelle, and this Court agrees with the ruling in that case that such a claim is essentially a state law claim of corporate mismanagement and breach of fiduciary obligations, and that the connection to a securities transaction is too tenuous to form the basis for a claim under the federal securities laws.
This rationale is in no way inconsistent with Bankers Life. As I read Bankers Life, it at most establishes the principle that a federal securities laws claim is stated by a complaint which alleges that defendants caused plaintiff to sell securities and fraudulently misappropriated the proceeds of that sale. It does not lay the groundwork for the recovery of funds imprudently invested and managed on behalf of the corporate plaintiff with the design of preventing the revelation of the corporation's disastrous financial condition.
As to the former category  the claim for damages resulting from the looting by the DanskersPMM, as noted, suggests that Bankers Life is also inapplicable to this portion of the Trustee's claim, based upon its reading of Bankers Life as being restricted to a situation where the securities sale and the looting are so nearly contemporaneous that the seller cannot be said to have ever received the proceeds from the sale. The Court finds it unnecessary either to adopt or reject this construction of Bankers Life, for I am convinced that PMM must be sustained on the alternative ground advanced in support of its position: i. e., that assuming that the damages suffered by IFC as a result of the looting by the Danskers does form the basis of a claim cognizable under the securities laws pursuant to Bankers Life, no such claim may be asserted against PMM because, as a matter of law, the conduct of PMM was not a proximate cause of such damages.
In order for a claim to be actionable under the federal securities laws, the injury must have been a proximate result of the misleading statements or omissions. Marbury Management, Inc. v. Kohn, 629 F.2d 795, CCH Fed.Sec.L.Rep. ¶ 97,357 at 97,399 (2d Cir. 1980). In accordance with traditional tort definitions, the requirement of proximate cause is satisfied if "the damage was either a direct result or a reasonably foreseeable result of the misleading statement." Globus v. Law Research Service, Inc., 418 F.2d 1276, 1291 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970).
In the instant case, the Trustee has attempted to satisfy this requirement by a series of "but for" connections linking the financial statements to the injury to IFC. Specifically, the Trustee's position is that but for the inaccurate financial statements, IFC would not have been able to sell its securities (or at least that IFC would not have been able to sell them for so high a price); that but for the sale of IFC securities, IFC would not have been in possession of any proceeds from such sales (or at least *540 that IFC would not have been in possession of such a quantity of funds); and that but for the existence of such monies, the Danskers would not have been able to utilize a portion of these for the personal benefit of themselves and others.
The Court is in agreement with PMM that such a "but for" chain does not establish that the looting was either a direct or a reasonably foreseeable result of the allegedly misleading financial statements. It is arguably foreseeable, as a result of financial statements overstating the financial condition of a corporation, that securities issued and sold by that corporation will command a price higher than their true value, that purchasers will be injured as a result and that the corporation will receive excessive funds in consideration for the securities. However, it is certainly not a direct or reasonably foreseeable result of such financial statements that inside management will embezzle such surplus funds for their personal use.
The Trustee's claim is merely that but for the allegedly misleading financial statements, the Danskers would not have been in a position to loot IFC, i. e., there would not have been IFC funds available both to use for their personal benefit and to continue to mask IFC's financial debility. Several courts which have addressed structurally similar claims have found the requisite proximate causal connection lacking.
For example, in Hoover v. Allen, 241 F.Supp. 213 (S.D.N.Y.1965), the plaintiffs, stockholders of the subject corporation, alleged that, by means of false and misleading financial statements, other stockholders of the corporation were induced by the defendants to sell their stock back to the corporation, thereby giving the defendants control of the corporation. The plaintiffs sought damages for certain acts of corporate waste committed by the defendants, which, the plaintiffs contended, would not have occurred but for the opportunity available to defendants resulting from their control of the corporation. The court dismissed the claim under Section 10(b), in part because of the absence of any proximate causal relationship:
"While it is logically true that `but for' corporate control the alleged acts of corporate waste could not have been committed, the `but for' test of causation has been fully discredited as a basis for imposing liability, particularly when, as here, such a test would also be the sole justification for federal intervention in a cause of action squarely posited on violations of state law." Id. at 229.
See also cases rejecting damage claims under Section 14(a) of the 1934 Act that but for proxy violations leading to the election of defendant directors, such directors would not have committed acts of corporate waste. E. g., Limmer v. General Telephone & Electronics Corp., CCH Fed.Sec.L.Rep. ¶ 96,111 (S.D.N.Y.1977); Lewis v. Elam, CCH Fed.Sec.L.Rep. ¶ 96,013 (S.D.N.Y. 1977); Levy v. Johnson, CCH Fed.Sec.L. Rep. ¶ 95,899 (S.D.N.Y.1977); Walner v. Friedman, 410 F.Supp. 29 (S.D.N.Y.1975).
In short, the Court concludes that the damages allegedly suffered by IFC were either not in connection with the purchase or sale of securities or were not the proximate result of the alleged securities laws violations by PMM.

B. Imputation to IFC

With the hope of laying the groundwork for several affirmative defenses to the various state law claims of the Trustee, PMM has urged the position that the knowledge and conduct of the Danskers (and others) must be legally imputed to IFC, so that IFC will be deemed to have known of all the alleged indiscretions of its inside management of which the Trustee complains.
The controlling legal principles under New York law are not in dispute. Generally, the knowledge of an agent acquired within the scope of his employment is imputed to the principal. E. g., Farr v. Newman, 14 N.Y.2d 183, 250 N.Y.S.2d 272, 199 N.E.2d 369 (Ct.App.1964); 200 East End Avenue Corp. v. General Electric Co., 5 A.D.2d 415, 172 N.Y.S.2d 409 (1st Dept. 1958), aff'd, 6 N.Y.2d 731, 185 N.Y.S.2d 816 (Ct.App.1959). The same rule applies to *541 information received by corporate agents. E. g., Scientific Holding Co., Ltd. v. Plessey Inc., 510 F.2d 15 (2d Cir. 1974); Yager Pontiac, Inc. v. Fred A. Danker & Sons, Inc., 41 A.D.2d 366, 343 N.Y.S.2d 209 (3d Dept. 1973), aff'd, 34 N.Y.2d 707, 356 N.Y. S.2d 860, 313 N.E.2d 340 (Ct.App.1974). However, when an agent is acting adversely to the interest of the principal, his knowledge and conduct are not imputed to the principal. E. g., Marine Midland Bank v. John E. Russo Produce, 50 N.Y.2d 31, 427 N.Y.S.2d 961, 405 N.E.2d 205 (Ct.App.1980); Lippes v. Atlantic Bank of New York, 69 A.D.2d 127, 419 N.Y.S.2d 505 (1st Dept. 1979). This "adverse interest" exception is not triggered, on the other hand, where the agent is also acting for the principal's benefit, even though the agent's primary interest is inimical to that of the principal. Farr v. Newman, supra, 250 N.Y.S. at 278, 199 N.E.2d at 373.
The parties diverge as to the application of the "adverse interest" exception to the agency relationship between IFC and the Danskers (and other IFC management personnel). PMM's position is that the complaint alleges that the Danskers, although motivated by personal interests, did benefit IFC by fraudulently obtaining for IFC huge quantities of funds from creditors and debenture holders. PMM points to the Trustee's own admission that IFC was actually insolvent as early as 1971 (224), and argues that "the Fraud" perpetrated by the Danskers benefited IFC by enabling it to continue operations into 1974. PMM characterizes the amounts misappropriated from IFC by the Danskers as relatively insignificant in comparison with the overall scheme to keep IFC afloat.
PMM's analysis of the events underlying the collapse of IFC may well be vindicated following discovery or at trial. But the Court cannot as a matter of law endorse PMM's appraisal of the complaint and the supplemental record on the instant motion. PMM's portrayal of the complaint is problematic in at least two respects.
First, in evaluating the monies acquired for IFC by the Danskers, one cannot ignore the subsequent misdirection of those funds, in part to the benefit of the Danskers personally or to the accounts of Dansker-controlled partnerships and in part into sham transactions and imprudent ventures designed to conceal the prior mismanagement of IFC. It cannot be seriously contested that these transactions were, on their face, not adverse to IFC's interests. PMM, however, contends that these transactions were predominantly incidental to the Danskers' effort to maintain IFC's financial facade.
In fact, the complaint charges just the opposite: that the false financial picture of IFC was incidental to the transactions themselves. The thrust of the complaint is that the Danskers created the false appearance of fiscal salubrity to conceal their past acts of mismanagement, and to raise capital for their further plundering. The complaint avers that this scheme was repeated through a number of cycles, each time driving IFC further into deficit and toward its ultimate financial ruin. PMM's attempt to highlight the Danskers' efforts to perpetuate the rosy picture of IFC in its financial statements is an incomplete appraisal of the total pattern of conduct of the Danskers, whose interests and conduct, as alleged in the complaint, were predominantly antagonistic to the interests of IFC.
Second, even to the extent one focuses upon the artificial financial picture of IFC created by the Danskers which prolonged IFC's existence several years beyond its actual insolvency, PMM's position is not persuasive. A corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it. The complaint plainly alleges that, as a result of the Danskers' practices, IFC's financial situation was caused to deteriorate even further after 1971. Accepting the allegations of the complaint as true, it is manifest that the prolonged artificial solvency of IFC benefited only the Danskers and their confederates, not IFC.
On this record, the Court cannot sustain PMM's position that the knowledge and conduct of the Danskers (and others) must be legally imputed to IFC.

*542 II. TRUSTEE'S CLAIMS

A. Fourth and Fifth Claims: Federal Securities Laws

The Trustee's fourth and fifth claims for relief respectively allege that PMM violated Sections 10(b) and 18 of the 1934 Act. The Court has already determined in Part I.A. of this Opinion that the Trustee has no direct cognizable claim against PMM under the federal securities laws because the damages suffered by IFC were either not in connection with the purchase or sale of securities or were not proximately caused by the alleged conduct of PMM. This does not end the inquiry, however, for the Trustee by his complaint has proffered two theories of secondary liability against PMM: (1) liability as an aider and abettor of violations of Sections 10(b) and 18 by others (presumably the Danskers), and (2) liability, pursuant to Section 20, as a "control person," in control of another who violated Section 10(b).
The imposition of aider and abettor liability requires the establishment of three elements: (1) the existence of a primary violation, (2) the defendant's knowledge of the primary violation, and (3) the defendant's knowing rendition of substantial assistance to the violator. See, e. g., Rolf v. Blyth, Eastman Dillon & Co., Inc., 570 F.2d 38 (2d Cir. 1978); Woodward v. Metro Bank of Dallas, 522 F.2d 84 (5th Cir. 1975); SEC v. Coffey, 493 F.2d 1304 (6th Cir. 1974), cert. denied, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975); Landy v. Federal Deposit Insurance Corp., 486 F.2d 139 (3d Cir. 1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). While the elements of a claim of aiding and abetting are thus distinguishable from the requisites for primary liability under Sections 10(b) and 18, I conclude that the discussion at Part I.A. of this Opinion is equally dispositive of the Trustee's aiding and abetting claims against PMM.
First, to the extent that the damages suffered by IFC have been determined not to have been incurred in connection with the purchase or sale of securities, it is manifest that there has been no primary violation of the federal securities laws, and thus that the Trustee cannot establish the first element of aider and abettor liability as to PMM.
Second, to the extent that the Trustee's claims relate to misappropriations which may possibly be the basis of securities laws claims under Bankers Life, supra, the absence of a sufficient causal link between PMM's alleged conduct and the looting by the Danskers is also fatal to the aiding and abetting claim. While it is true that the scienter requirements of the second and third elements of aider and abettor liability may be satisfied under these circumstances by "recklessness,"[4] aider and abettor liability may not be imposed where the fraud is not a direct or reasonably foreseeable consequence of the reckless conduct. See, e. g., Restatement 2d Torts § 876, Comment on Clause (b) at p. 317 (1979); see also Part I.A., supra. For the same reasons, the Trustee's claim that but for the misleading financial statements, IFC would not have been able to sell its securities and would not have acquired the funds which were looted by the Danskers, is both too speculative and too tenuous to satisfy the requirement that the assistance rendered by the purported aider and abettor have been substantial. See Woodward, supra at 97. While PMM's *543 alleged recklessness may have been a substantial factor in the injury suffered by the investors, it was not such a factor in the injury to IFC for which the Trustee seeks redress here.
Finally, the Trustee has sought to impose liability upon PMM under Section 20, which provides in pertinent part:
"(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
"(b) It shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person."
15 U.S.C. § 78t. The Securities and Exchange Commission has defined "control" as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12(b)-2(f) (1980). The Trustee has put forward three theories of Section 20 liability on the part of PMM.
First, in support of a claim pursuant to Section 20(a), the Trustee argues that PMM, by aiding and abetting the Danskers, exercised with the Danskers joint control of IFC. This theory fails for two reasons. First, the allegations of the complaint, accepted as true, cannot support the conclusion that PMM, even as it allegedly aided and abetted the Danskers, exercised "control" over IFC. Second, even if PMM "controlled" IFC, Section 20(a) requires that the control be exercised over one liable under the securities laws. Since the Trustee does not allege a primary violation of the 1934 Act by IFC, "control" over IFC cannot trigger Section 20(a) liability.
Second, in support of claims apparently pursuant to both Sections 20(a) and 20(b), the Trustee argues (1) that Peat Marwick's liability under Section 20(a) may be predicated on its control over any of its partners or employees (i. e., Jerome Lowengrub) found to have violated the 1934 Act, and (2) that the liability of Mr. Lowengrub under Section 20(a) (both individually and on behalf of the purported class of Peat Marwick partners) would follow from his control over Peat Marwick should Peat Marwick be found to have violated the 1934 Act. Needless to say, the Trustee cannot on this theory ground the liability of both Peat Marwick and Mr. Lowengrub solely on Section 20, but must independently establish the liability of the "controlled" person before utilizing Section 20 to reach the "controlling person." Since, as has been determined above, the Trustee has no independent claim against PMM under the 1934 Act, this second theory of Section 20 liability collapses.
Third, the Trustee argues that PMM could be found liable for aiding and abetting a violation of Section 20(a) if the Trustee proves that PMM aided and abetted the Danskers, who exercised "control" over IFC. This theory is fatally defective for three reasons:
(a) the concept of aiding and abetting a Section 20 violation is a non sequitur, for Section 20 is merely a statutory embodiment of the principle of respondeat superior, not a substantive provision proscribing specified conduct;
(b) the Trustee's theory encounters the same obstacles as his other theories of aider and abettor liability, discussed above; and
(c) while Section 20 liability is predicated upon a substantive violation of the 1934 Act by the "controlled" person, here the "controlled person" is IFC, against whom the Trustee has of course alleged no such violation.
For these reasons, PMM's motion to dismiss is granted as to the Trustee's fourth and fifth claims.

*544 B. Seventh and Eighth Claims: State Securities Laws

The Trustee's seventh and eight claims allege PMM's primary or aider and abettor liability under Sections 352-c and 339-a of the New York General Business Law, respectively. Section 352-c provides in relevant part:
"It shall be illegal and prohibited for any person, partnership, corporation, company, trust or association, or any agent or employee thereof, to use or employ any of the following acts or practices:
"(a) Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;
"(b) Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;
"(c) Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made;
where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities, as defined in section three hundred fifty-two of this article, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted."
Section 339-a provides:
"Any person, who, with intent to deceive, makes, issues or publishes, or causes to be made, issued or published, any statement or advertisement as to the value or as to facts affecting the value of the stocks, bonds or other evidences of debt of a corporation, company or association, or as to the financial condition or facts affecting the financial condition of any corporation, company or association which has issued, is issuing or is about to issue stocks, bonds or other evidences of debt, and who knows, or has reasonable ground to believe that any material representation, prediction or promise made in such statement or advertisement is false, is guilty of a misdemeanor."
By their terms, these sections of the New York Martin Act, as do their federal counterparts under the 1933 and 1934 Acts, limit implied private damage actions to injuries incurred in connection with a securities transaction. See Superintendent of Insurance v. Freedman, 443 F.Supp. 628 (S.D.N.Y.1977); Gross v. Diversified Mortgage Investors, 431 F.Supp. 1080 (S.D.N.Y. 1977); Lupardo v. I. N. M. Industries Corp., 36 F.R.D. 438 (S.D.N.Y.1965); Grenthal v. American Guarantee & Liability Ins. Co., 5 Misc.2d 994, 161 N.Y.S.2d 985 (N.Y.Co.1957). Similarly, a proximate causal connection between the alleged wrongdoing and the purported damages is a necessary element of such an action. See Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, 378 F.Supp. 112 (S.D.N.Y.1974), aff'd in part and rev'd in part on other grounds, 540 F.2d 27 (2d Cir. 1976). Thus, the Trustee's inability to allege damages suffered both in connection with the purchase or sale of securities and as a proximate result of PMM's alleged malfeasance, with the consequent dismissal of his federal securities laws claims, see Parts I.A. and II.A. above, is equally fatal to his state securities laws claims.
Additionally, Section 339-a, a criminal statute, requires that the defendants have acted with the "intent to deceive." Disregarding the conclusory tracking of the statutory language, the factual allegations of the complaint, if proven, would at most support a finding that PMM acted "recklessly." While in certain contexts "recklessness" may be the legal equivalent of "knowledge," in the absence of New York or other persuasive authority to the contrary, this Court is unwilling to hold that "recklessness" satisfies a criminal statutory requirement of "intent to deceive."
For these reasons, PMM's motion to dismiss is granted as to the Trustee's seventh and eighth claims.

*545 C. Third Claim: Aiding and Abetting Common Law Fraud

The Trustee's third claim alleges that PMM aided and abetted the commission of "the Fraud," apparently on a common law fraud theory. As discussed in Part II.A. of this Opinion, the general elements of a claim of aiding and abetting fraud are (1) a fraud, (2) defendant's knowledge of the fraud, and (3) defendant's knowing rendition of substantial assistance thereto. In support of its position that the Trustee has failed to state a claim meeting these requirements, PMM has advanced the following three contentions, none of which mandates the result sought by PMM.
First, PMM contends that there was no fraud committed against IFC, but that any fraud was rather committed by IFC, because the Fraud was allegedly perpetrated primarily by the Danskers and other IFC executives. This argument is not persuasive because it is premised upon the previously rejected contention that the knowledge and conduct of the Danskers is imputed to IFC. See Part I.B.
Second, PMM argues that the Trustee has failed to allege the requisite scienter with respect to the second and third elements of aider and abettor liability; i. e., actual knowledge of the fraud. Under New York law, however, a common law claim of fraud against accountants need not be based upon actual knowledge, but in fact may be grounded upon a claim of recklessness. State Street Co. v. Ernst, 278 N.Y. 104, 15 N.E.2d 416 (1938). The Second Circuit Court of Appeals cited that decision in support of its conclusion that where the alleged aider and abettor owes a fiduciary duty to the defrauded party, recklessness satisfies the scienter requirement for a claim of fraud under the federal securities laws. Rolf v. Blyth, Eastman Dillon & Co., Inc., 570 F.2d 38 (1978). Accordingly, this Court is of the view that, under the circumstances of this case involving an accountant-client relationship, a reckless disregard of material facts amounting to constructive knowledge of the fraud would be sufficient to satisfy the scienter requirement for a claim of aiding and abetting common law fraud. See Part II.A., n.4; see also Langley Federal Credit Union v. Harp, 471 F.Supp. 565, 575 (D.D.C.1979) (although not deciding the issue, district court noted that claims of aiding and abetting violation of Section 10(b) and common law fraud may sometimes be based upon reckless conduct, citing Rolf, supra). Consequently, the Court concludes that the Trustee's allegations of recklessness are sufficient averments of scienter to withstand PMM's motion as to the instant claim.
Third, PMM alleges that the Trustee's complaint fails to plead fraud on the part of PMM with the specificity required by Rule 9(b), F.R.Civ.P. Essentially, the teeth of this argument have been removed by the Court's conclusion as to the scienter requirement, above. While there would undoubtedly be substance to PMM's claim if the Trustee were required to plead facts demonstrating actual knowing participation in or assistance to the fraud, in fact the Trustee has stated with the requisite particularity his claim that PMM by its reckless conduct has aided and abetted the perpetration of common law fraud.
One additional point needs to be addressed regarding the Trustee's third claim. In part II.A. of this Opinion, the Court granted PMM's motion to dismiss the Trustee's claim that PMM aided and abetted securities laws fraud, in part because to the extent such damages were arguably suffered in connection with the purchase or sale of securities, the injury to IFC did not proximately result from the alleged conduct of PMM. This principle is no less applicable to the Trustee's third claim. While the damages upon which IFC bases its third claim need not have been incurred in connection with the purchase or sale of securities, they must have been proximately related to the alleged conduct by PMM. It is apparent from the discussion at Part II.A. of this Opinion that the Trustee's claims against PMM for amounts looted from IFC, as opposed to amounts "misdirected" on its behalf, by the Danskers do not satisfy this causation requirement. To the extent the *546 Trustee seeks recovery from PMM under his third claim for injuries suffered by IFC other than the alleged misappropriations by the Danskers, he must prove facts establishing the requisite causal nexus consistent with this Opinion.

D. Nineteenth Claim: Breach of Contract

The Trustee's nineteenth claim alleges that PMM breached its contract with IFC by failing to perform its accounting services in accordance with applicable professional standards. PMM contends that since it did not by contract guarantee a specific result, and since the purported breach of contract is simply PMM's failure to perform in accordance with the standards of the accounting profession, the claim is one of malpractice or negligence, not breach of contract.[5] PMM relies upon Carr v. Lipshie, 8 A.D.2d 330, 187 N.Y.S.2d 564 (1st Dept. 1959), aff'd, 9 N.Y.2d 983, 218 N.Y.S.2d 62, 176 N.E.2d 512 (1961). In Carr, the First Department held that a claim for breach of contract against accountants for failure to perform duties in accordance with generally accepted accounting principles, without more, states only a claim in tort rather than in contract.
"This case falls within the orbit of those involving some form of malpractice by those engaged in one of the professions. Actions for breach of contract have been sustained where a specific result is guaranteed by the terms of the agreement, but not where the contracting party either expressly or impliedly promises to perform services of the standard generally followed in the profession or promises to use due care in the performance of the services to be rendered. The pleading herein does not allege a promise to accomplish a definite result as, for example, in Robins v. Finestone, 308 N.Y. 543, 127 N.E.2d 330. It merely states that the defendants would perform the services with due care and in accordance with the recognized and accepted practices of the profession." Id. 187 N.Y.S.2d at 567.
Carr v. Lipshie has been followed on numerous occasions and, if still valid, would undoubtedly mandate a dismissal of the Trustee's contract claim here. However, the Trustee contends that the continuing vitality of Carr v. Lipshie has recently been called into question.
In two recent decisions, Paver & Wildfoerster v. Catholic High School Association, 38 N.Y.2d 669, 382 N.Y.S.2d 22, 345 N.E.2d 565 (1976) and Sears, Roebuck & Co. v. Enco Associates, Inc., 43 N.Y.2d 389, 401 N.Y.S.2d 767, 372 N.E.2d 555 (1977), the New York Court of Appeals sustained contract claims against architects notwithstanding the absence of any contractual guarantee of a specific result by defendants. Dicta in these opinions could conceivably support a reading of these cases as broadly establishing a general rule that, where the injury is pecuniary rather than personal, and where the liability alleged has its genesis in a contractual relationship, a breach of contract claim against a professional is viable notwithstanding the absence of a promise of any specific result beyond the professional duty of care. However, the Court of Appeals in Paver cited Carr v. Lipshie in recognition of its historical significance and did not purport to overrule it, and in Sears, Roebuck specifically stated its holding as applying only to claims against architects.
While one may speculate about the future direction of the New York Court of Appeals in this area, I cannot read Paver or Sears, Roebuck as altering the rule of Carr v. Lipshie. Consequently, PMM's motion to dismiss is granted as to the Trustee's nineteenth claim.

E. Twentieth and Twenty-Second Claims: Negligence

As to the Trustee's twentieth and twenty-second claims, grounded in negligence, *547 PMM advances four grounds in support of its motion. PMM first argues that a plaintiff has no claim for damages against a defendant based on the defendant's negligent failure to stop the plaintiff from committing an intentional tort. PMM's second argument is that IFC, as the defrauder, had knowledge of its own conduct, and therefore could not have acted in reliance on PMM's failure to apprise it of the improper nature of its conduct. Each of these points fails because it is based on the erroneous premise that the acts of the Danskers are imputed to IFC. See Part I.B.
PMM's third contention is that the intentional interference with PMM's performance of its duties by certain IFC officers and directors, admitted by virtue of the inclusion of such allegations in certain contexts in the complaint, precludes IFC's claim against PMM. Since such conduct by IFC officers and directors is not imputed to IFC, see Part I.B., IFC is not barred from raising the issue of PMM's negligence.
This is not to suggest that the interference with PMM's performance of its duties is irrelevant. Such interference will be of obvious significance to the trier of fact in determining whether or not PMM was negligent. However, the Court cannot at this point rule that PMM was not negligent as a matter of law on the skeletal admission that certain IFC directors and officers in some instances interfered with PMM's performance of its professional obligations.
PMM's final argument as to this claim is that it is barred in part by the statute of limitations. By virtue of the tolling provisions of the Bankruptcy Act, 11 U.S.C. § 29(e), this action is effectively deemed to have commenced on October 21, 1974. Pointing to the three-year statute of limitations governing claims of accountants' malpractice, N.Y.C.P.L.R. § 214(6), PMM argues that claims accruing prior to October 21, 1971 are time-barred.
The Trustee raises three arguments in an effort to preserve pre-October 21, 1971 claims. First, the Trustee argues that his negligence claims are governed by N.Y. C.P.L.R. Section 213(7), which provides for a six-year limitation for
"an action by or on behalf of a corporation against a present or former director, officer or stockholder for an accounting, or to procure a judgment on the ground of fraud, or to enforce a liability, penalty or forfeiture, or to recover damages for waste or for an injury to property or for an accounting in conjunction therewith."
Since PMM is not "a present or former director, officer or stockholder," the Trustee's reliance upon Section 213(7) is ill-founded. It is clear that following the promulgation of Section 214(6), professional negligence claims against accountants are governed by a three-year limitation. See, e. g., Poloron Products v. Lybrand Ross Bros. & Montgomery, 72 F.R.D. 556, 562 (S.D.N. Y.1976); Wilkin v. Dana R. Pickup & Co., 74 Misc.2d 1025, 347 N.Y.S.2d 122 (Allegheny Co. 1973); Wasserman v. Herwood, 36 Misc.2d 522, 232 N.Y.S.2d 730 (N.Y.Co.1962).
Second, the Trustee claims that the "continuous treatment doctrine" tolled the running of the statute for the years 1968 through 1971, the period PMM was engaged by IFC. Originating in the medical malpractice decision in Borgia v. New York, 12 N.Y.2d 151, 237 N.Y.S.2d 319, 187 N.E.2d 777 (Ct.Appeals 1962), the doctrine requires that "when the course of treatment which includes the wrongful acts or omissions has run continuously and is related to the same original condition or complaint, the `accrual' comes only at the end of the treatment," reasoning that "[i]t would be absurd to require a wronged patient to interrupt corrective efforts by serving a summons on the physician ...." Id. 237 N.Y.S.2d at 321-22, 187 N.E.2d at 779. The Court of Appeals cautioned that "[t]he `continuous treatment' we mean is treatment for the same or related illnesses or injuries, continuing after the alleged acts of malpractice, not mere continuity of a general physician-patient relationship." Id., 237 N.Y.S.2d at 322, 187 N.E.2d at 779. The doctrine has been extended to claims of malpractice by accountants. Wilkin, 347 N.Y.S.2d at 125.
The issue here is whether the IFC-PMM relationship constituted a single, continuous *548 "treatment," or simply a general accountant-client relationship. PMM argues that at worst each annual audit constituted an individual "treatment," otherwise the doctrine would be triggered by the mere uninterrupted, general accountant-client relationship.
It has been held that the question of "continuous treatment" is one primarily for the jury. Gnoj v. New York, 29 A.D.2d 404, 288 N.Y.S.2d 368, 369 (1st Dept. 1968). It is also apparent that the application of this doctrine has been expanded somewhat beyond the scope of its original rationale as expounded in Borgia, supra. See Modave v. Long Island Jewish Medical Center, 501 F.2d 1065, 1077 (2d Cir. 1974). In any event, the Court concludes that resolution of this issue in the context of a motion purportedly directed at the face of the pleadings would be premature, for the parties in their submissions have evidenced that there are disputed factual issues, for example, as to the independence of each annual audit from prior annual audits. See Wilkin v. Dana R. Pickup & Co., 74 Misc.2d 1025, 347 N.Y.S.2d 122 (Allegheny Co. 1973). Consequently, the Court declines at this time and on this record to rule as a matter of law on the applicability of the continuous treatment doctrine. If appropriate, the parties may seek to raise the issue at the conclusion of discovery.
The Trustee's third attempt to preserve his negligence claims accruing prior to October 21, 1971 is by invoking the "equitable tolling" or "fraudulent concealment" doctrine. PMM raises four reasons why, in its view, the Trustee cannot rely upon the doctrine:
(1) a claim predicated upon negligence inherently lacks the requisite elements for fraudulent concealment;
(2) the complaint fails to allege specific acts of fraudulent concealment by PMM;
(3) PMM did not actually know of IFC's true financial condition and thus could not have fraudulently concealed it; and
(4) IFC through its management knew of the fraud and thus could not have been deceived.
PMM's first point is irrelevant because the complaint adequately pleads recklessly aiding and abetting fraudulent concealment. See Part II.C. As to PMM's second point, it is true that no affirmative misrepresentation by PMM is pleaded in support of the Trustee's claim of fraudulent concealment, but New York law appears to be that nondisclosure may trigger the doctrine, where, as here, the defendant is a fiduciary and thus has a duty to speak. See J. McLaughin, Practice Commentaries to CPLR 201, C201:6 at 60 (7B McKinney 1972); see also Saylor v. Lindsley, 302 F.Supp. 1174, 1187 (S.D.N.Y.1969); Erbe v. Lincoln Rochester Trust Co., 13 A.D.2d 211, 214 N.Y.S.2d 849, 852 (4th Dept. 1961), appeal dismissed, 11 N.Y.2d 754, 226 N.Y.S.2d 692, 189 N.E.2d 629 (Ct.App.1962). PMM's third point erroneously presumes that an allegation of actual knowledge, as distinguished from constructive knowledge resulting from the reckless disregard of material facts, is necessary to satisfy the scienter requirement for a claim of fraud. See Part II.B. And PMM's fourth point is grounded upon the previously rejected contention that the knowledge and conduct of the Danskers and certain other IFC management personnel are imputed to IFC. See Part I.B. Consequently, the Court cannot rule, on this record, that as a matter of law the fraudulent concealment doctrine is inapplicable to the Trustee's negligence claims against PMM.
PMM has also raised one additional point relating solely to the twenty-second claim, which avers in relevant part that
"as a consequence of their activities as accountants for IFC Peat Marwick, Leidesdorf, Lowengrub and Saltzman jointly and severally are liable for any and all contributions made to the Profit Sharing Plan for the years in which they certified the financial statements of IFC."
PMM begins its argument by quoting, as the purportedly relevant portion of the twenty-second claim, the above-quoted passage, substituting an ellipsis for the phrase *549 "jointly and severally." PMM next alleges that the Trustee, by virtue of an affidavit submitted in connection with a prior motion, has admitted that contributions to the Profit Sharing Plan were made in 1967, 1969 and 1973. Since PMM was not the IFC auditor in either 1967 or 1973, PMM argues that under the terms of the claim, PMM is charged with liability only in connection with the 1969 contribution. The Trustee has not offered a response to this point.
The Court finds PMM's rationale and purpose difficult to understand. If, as PMM contends, the twenty-second claim does not allege PMM's liability relating to the 1967 and 1973 contributions, then PMM stands to gain nothing by its motion to dismiss. If, in addition, PMM is seeking to have the Court confirm its interpretation of the twenty-second claim, the Court sees no reason to do so.
For the above-stated reasons, PMM's motion to dismiss is denied as to the Trustee's twentieth and twenty-second claims.

F. Twenty-Seventh Claim: Fraudulent Transfers

The Trustee's twenty-seventh claim alleges that eighteen payments made by IFC to PMM from June 12, 1972 through April 16, 1974 were made without fair consideration and were thus fraudulent conveyances as defined by Section 67(d) of the Bankruptcy Act, 11 U.S.C. § 107, or §§ 273, 273-a, 274 or 275 of the New York Debtor and Creditor Law.
PMM raises two objections to the legal sufficiency of this claim. First, PMM argues that Section 67(d)(2) of the Bankruptcy Act makes transfer within one year prior to the filing of the petition a requisite element of a "fraudulent transfer," and that seventeen of the eighteen payments to PMM were made more than one year prior to the filing of the petition. The argument ignores the fact that Sections 273, 273-a, 274 and 275 of the New York Debtor and Creditor Law do not restrict "fraudulent transfers" to such a one-year period.
Second, PMM states that the IFC payments to PMM were apparently fees for accounting services, and that the only conceivable basis for a claim that fair consideration was not received by IFC is the allegation that PMM failed to perform its duties in accordance with accepted professional standards. This, argues PMM, is simply a claim for malpractice which should not be cognizable as a fraudulent transfer claim.
The concept of a fraudulent transfer, argues PMM, is inherently limited to exchanges in which the consideration received by the bankrupt is quantitatively of less value than the transferred consideration. Thus, PMM suggests, if the complaint alleged that PMM had not actually worked the hours billed for or was billing at an improperly high rate, then a fraudulent transfer claim might be stated. But, PMM argues, the concept was never intended to embrace an inquiry into the quality of professional services. The Trustee's claim, PMM continues, is one of professional malpractice cognizable, if at all, by a traditional claim of such. To permit the assertion of a fraudulent transfer claim here, PMM concludes, would be to extend unprecedentedly the specialized nature of fraudulent transfer claims into the area of professional malpractice whenever the client is or becomes insolvent after the allegedly unsatisfactory services are rendered. The Court agrees with PMM that to define "unfair consideration" for purposes of stating a fraudulent transfer claim to include failure to meet professional standards in the performance of professional services  without any additional allegations of, e. g., fraudulent agreement by the professionals involved to render inaccurate reports as part of an overall scheme to defraud investors, or of billing irregularities by the professionals involved, such as padding hours worked or setting fees significantly in excess of market rates  would be an expansion of the doctrine creating a substantial burden on trustees and bankruptcy courts to examine the quality of every professional service rendered to a bankrupt in the period preceding bankruptcy.
*550 Notably, the Trustee in his many submissions has not contested PMM's position. Nor has the Court's own inquiry disclosed any precedent for the expansion of the fraudulent transfer doctrine that the Trustee seeks by his claim. In the absence of any such authority, the Court will not endorse the Trustee's novel position.
Accordingly, PMM's motion to dismiss is granted as to the Trustee's twenty-seventh claim.

ADDENDUM
Each and every claim asserted by the Trustee against PMM has also been asserted against S. D. Leidesdorf & Co. (IFC's independent auditors for the years 1972 and 1973) and Robert Saltzman (individually and on behalf of a purported class of Leidesdorf partners) (collectively "Leidesdorf"). Leidesdorf has also moved for judgment on the pleadings or for summary judgment, which motion is before the Court on Leidesdorf's objections to Magistrate Raby's recommendations in his Report No. 20. With the exception of the different years of engagement, the allegations of the Trustee's complaint against Leidesdorf are identical to those asserted against PMM. Accordingly, in support of its motion Leidesdorf has adopted by reference all of the grounds asserted by PMM in support of its motion, in addition to certain other contentions which, because of the disposition of PMM's motion, need not be addressed by the Court. Consequently, for the reasons set forth in this Opinion and Order, Leidesdorf's motion is granted in part and denied in part to the same extent as PMM's motion.

CONCLUSION
The motions of PMM and Leidesdorf for judgment on the pleadings or for summary judgment are granted as to the Trustee's fourth, fifth, sixth, seventh, eighth, nineteenth and twenty-seventh claims, and denied as to the Trustee's third, twentieth and twenty-second claims.
SO ORDERED.
NOTES
[1] Parenthetical citations are to numbered paragraphs of the complaint.
[2] The Trustee has standing only on behalf of IFC, and not on behalf of purchasers of IFC securities. Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972).
[3] In several affidavits the Trustee has provided the Court with lists of purported securities transactions involving IFC upon which the Trustee wishes to base his claims under the securities laws. PMM has objected to these lists because (1) many of the transactions do not involve securities, and (2) many of the transactions are not described as the basis of any claim in the complaint. It is not necessary to address these points, however, for to the extent IFC was a seller of securities, the issues addressed in this Opinion will be dispositive. It does appear from the complaint that in certain instances IFC repurchased or redeemed its own debentures. While IFC may have paid more than fair value for such repurchases, such losses cannot be fractionated from the gains resulting from the original sales at artificially high prices, and cannot be the basis for a securities laws claim apart from the Trustee's general claim regarding the sale of securities by IFC, Byrnes v. Faulkner, Dawkins & Sullivan, 550 F.2d 1303, 1314 (2d Cir. 1977); Mark v. Chessie System, Inc., 74 Civ. 4553 (S.D.N.Y. May 2, 1978) (WCC). The same principle governs other purported securities repurchases by IFC.
[4] PMM has contended that only actual knowledge of the fraud can constitute scienter for the imposition of aider and abettor liability under the federal securities laws. The Trustee's position is that knowledge and reckless disregard of material facts amounting to constructive knowledge of the fraud is sufficient, and that in any event the Trustee has alleged that PMM had actual knowledge of the fraud. The Court is in agreement with PMM that the factual allegations of the complaint, disregarding the occasional conclusory statements as to PMM's actual knowledge, are sufficient only to support allegations that PMM recklessly failed to discover errors in IFC's financial statements. However, it is now settled in this Circuit "that at least where, as here, the alleged aider and abettor owes a fiduciary duty to the defrauded party, recklessness satisfies the scienter requirement" (footnote omitted). Rolf, supra at 44. Plainly an independent auditor's obligation to investigate and disclose brings the accountant-client relationship within the ambit of fiduciary relationships governed by Rolf.
[5] The ultimate significance of PMM's contention is that the statute of limitations for a contract action is six years, N.Y.C.P.L.R. § 213(2), whereas a claim of malpractice is governed by a three-year statute of limitations, N.Y.C.P.L.R. § 214(6).