Charles J. KANE, Charles J. Kane, P.A., Charles J. Kane and Natalie F. Kane, as Trustees of Charles J. Kane, P.A. Pension and Profit Sharing Plans and Trusts, Plaintiffs–Appellees/Cross–Appellants,

v.

SHEARSON LEHMAN HUTTON, INC., f/k/a Shearson Loeb Rhoades, Inc., and Rheta Raven, Defendants–Appellants/Cross–Appellees.

No. 89–5801.

United States Court of Appeals, Eleventh Circuit.

Nov. 6, 1990.

---

644

Stanley A. Beiley, Robert M. Sondak, Paul, Landy, Beiley & Harper, P.A., Miami, Fla., for defendants-appellants/cross-appellees.

Jeffrey Allen Tew, Kirkpatrick & Lockhart, Miami, Fla., for plaintiffs-appellees/cross-appellants.

Before HATCHETT and CLARK, Circuit Judges, and MORGAN, Senior Circuit Judge.

MORGAN, Senior Circuit Judge:

## FACTS

Plaintiffs/appellees (hereinafter referred to collectively as "Kane") opened an account with Shearson Loeb Rhodes (hereinafter referred to as "Shearson"), defendant/appellant, in 1979. Defendant/appellant Rheta Raven became Kane's broker in September 1980. Before that time, Raven had worked as a secretary at Shearson, and Kane knew he was Raven's first client at Shearson.

Raven had received no formal training to become a broker and had never done any research on the oil and gas industry. Shearson gave Raven no training after she became a broker and provided no instructions about Shearson's rules and administrative directives.

Administrative directives in effect at Shearson during the relevant period prohibited brokers from (1) soliciting securities not recommended by the firm, (2) informing customers of unsubstantiated rumors about public companies, and (3) contacting any official of an issuer. Branch managers were required to review all customers' accounts to detect "speculative activity," "concentration of any one security," or "low grade securities."

In October 1980, Raven told Kane about March Resources, a company she claimed was expecting an oil strike within weeks. At Raven's solicitation, Kane began purchasing March Resources stock. Although the oil strike never occurred, Kane continued purchasing and holding March Resources stock because of Raven's advice and encouragement. In December 1980, Raven told Kane that Amoco had offered $75 a share for March. This statement was not true.

Raven had become aware of March Resources when a customer asked her to investigate the company. Raven spoke with someone in the Shearson research library in New York about March Resources and was read the one page of information on file. Raven then contacted Frank Matthews, an executive at March Resources, and began receiving press releases from the company. On the basis of this information, she began soliciting buyers for March Resources stock.

March Resources was not on the list of Shearson's recommended stocks, and Raven at no time asked a Shearson research analyst to investigate the company. Larry Wasserman, the Shearson branch manager, was aware that Raven received press releases from March Resources and that she passed them on directly to her clients. He knew or should have known of the trading in March Resources stock in the Miami Beach office.

In March 1981 Kane hired Martin Raven, Rheta's husband, as his investment advisor but continued to rely on Rheta as well. On May 4, 1981, Rheta and Martin advised Kane to sell his March Resources stock during a "temporary market correction" and reinvest in March Resources after the correction. Kane sold his stock at a profit and three days later was notified to reinvest. On May 7, relying on the advice of Martin and Rheta Raven, Kane purchased 9600 shares of March Resources stock for $196,399.

Rheta Raven had advised all her customers to sell, then buy back, their March Resources stock. As a result of this trading activity, Shearson's compliance department in New York wired Wasserman to stop all solicitation of March stock until researchers could determine if March's prospects warranted the excessive investment by Shearson's Miami Beach customers. Three days later, Raven forwarded all information she had on March Resources to Shearson's director of research. Unfortunately, no further action was taken by Shearson in regard to March Resources, and the company remained uninvestigated. Had Shearson researched March Resources at that time, Shearson would have discovered negative information about the company on file at the Vancouver Stock Exchange.

Later in May, Kane became concerned after seeing an unfavorable article in *Newsweek.* Rheta Raven sought to reassure him and claimed to have contrary information from independent geologists. Raven also stated that the Shearson research department, Shearson's representative at the Vancouver Stock Exchange and the Securities Exchange Commission had all given March Resources a clean bill of health.

Despite Raven's assurances, the March Resources stock price began to decline. Kane ultimately sold his shares for a loss of $137,796.

Kane filed suit against the defendants in state court in 1981. That suit was dismissed in 1985 when the parties agreed to arbitration. The suit was refiled in 1986 in the Southern District of Florida with a stipulation for arbitration. Kane alleged in his complaint that Shearson and Raven violated civil RICO statutes, 19 U.S.C. §§ 1962 and 1964 (count I); § 12(2) of the Securities Act of 1933 (count II); § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder (count III); Florida securities laws, Fla.Stat. §§ 517.301 and 517.211 (1980) (count V); committed common-law fraud (count IV) and negligence (count VI); and breached their fiduciary duty (count VII).

The arbitration panel found that defendants had violated § 12(2) of the 1933 Act, § 10(b) of the 1934 Act, and the state securities laws. The arbitrators found negligence and breach of fiduciary duty as well. Kane was awarded damages of $28,322.

Kane appealed the damages award to the district court pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.,* and the parties' stipulation for arbitration. Shearson and Raven cross-appealed. The district court held that there had been no violation of federal law. But the panel's decision was upheld on the Florida securities law claim, as well as on the common-law negligence and breach of fiduciary duty claims. The district judge disagreed with the measure of damages used by the arbitrators, however, and found that Kane should recover the entire $137,797 lost on the sale of the March Resources stock purchased May 7. Interest at a twelve percent annual rate was awarded as well. Both parties appeal to this Court.

## DISCUSSION

The only issue is whether the district court erred in its determination of the correct measure of damages. Shearson contends that the district court should not have increased the arbitrators' award. The panel's award offset the profit Kane made on the May 4 sale of stock against the $137,797 loss suffered on the sale of the March Resources stock purchased May 7. Kane argues that the district judge was correct in his calculation of the award under Florida securities law, but asserts that the proper measure of damages for the common-law claims of negligence and breach of fiduciary duty produces an even higher figure than that awarded under the securities laws and that the higher amount should have been awarded.

A. *Measure of Damages Under Florida Securities Law*

■ Section 517.211 provides a remedy for violation of the antifraud provision, § 517.301:

(2) Any person purchasing or selling a security in violation of s. 517.301, and

every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase, is jointly and severally liable to the person selling the security to or purchasing the security from such person in an action for rescission, if the plaintiff still owns the security, or for damages, if the plaintiff has sold the security.

(3) In an action for rescission:

(a) A purchaser may recover the consideration paid for the security or investment, plus interest thereon at the legal rate, less the amount of any income received by the purchaser on the security or investment upon tender of the security or investment.

(b) A seller may recover the security upon tender of the consideration paid for the security, plus interest at the legal rate, less the amount of any income received by the defendant on the security.

(4) In an action for damages brought by a purchaser of a security or investment, the plaintiff shall recover an amount equal to the difference between:

(a) The consideration paid for the security or investment, plus interest thereon at the legal rate from the date of purchase; and

(b) The value of the security or investment at the time it was disposed of by the plaintiff, plus the amount of any income received on the security or investment by the plaintiff.

Fla.Stat. § 517.211(2)–(4).

The remedial effect of § 517.211 is similar to that of § 12(2) of the Securities Act of 1933. *E.F. Hutton v. Rousseff*, 537 So.2d 978, 981 (Fla.1989), *answering question certified in* 843 F.2d 1324 (11th Cir. 1988). The remedy specified is rescission, or rescissionary damages if the defrauded purchaser has already disposed of the secu-

rities. *Id.* *See also* Fla.Stat. § 517.241 (stating that "the same civil remedies provided by laws of the United States for the purchasers or sellers of securities ... extend to purchasers or sellers of securities under this chapter").

Kane is correct when he states that there is no support to be found under federal or Florida law for the "netting" theory Shearson argues for here. What is found, under both federal and Florida law, is the intent to have securities antifraud provisions enforced stringently to deter fraud. *Randall v. Loftsgaarden*, 478 U.S. 647, 663, 106 S.Ct. 3143, 3153, 92 L.Ed.2d 525 (1986). As the district judge noted, "If the ... methodology espoused by [Shearson] were adopted, it could serve as a license for broker-dealers to defraud their customers with impunity up to the point where losses equaled prior gains."

Further, there is nothing in the language of § 517.211 to indicate that the Florida legislature intended to force victims of fraud to aggregate their profits and losses from separate transactions that happened to involve the same defendant and thus reduce their recoveries. Instead, the plain language of the statute reveals the intent to allow a purchaser fraudulently induced into purchasing a security to rescind his purchase, or, if he has already sold at a loss, to be put by an award of damages in as good a position as if he had rescinded the transaction. There is no indication that other transactions are relevant to this calculation at all.

In *Merchant v. Oppenheimer & Co.*, 568 F.Supp. 639 (E.D.Va.1983), *rev'd in part on other grounds, Dixon v. Oppenheimer & Co.*, 739 F.2d 165 (4th Cir.1984), the court came to a similar conclusion when construing a Virginia remedial statute similar to the Florida law at issue here.[1]

The plaintiff sought rescission of a certain series of transactions while the defen-

---

1. The Virginia statute provided, *inter alia,* that any person who sold a security in violation of a registration requirement:

> Shall be liable to the person purchasing such security from him who may sue either at law or in equity to recover the consideration paid for such security, together with interest thereon at the rate of six percent per annum, costs,

and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of such security, or for the substantial equivalent in damages if he no longer owns the security.

*Id.* at 640 n. 2 (quoting Va.Code Ann. § 13.1–522(A)).

dant broker-dealer argued that the plaintiff should be required to aggregate all transactions to arrive at the proper measure of damages. The court held that the plaintiff buyer was entitled to rescission or full rescissionary damages for any sale in violation regardless of whether the buyer happened to profit from other sales. *Id.* at 643–44. We think this is the only possible interpretation.

### B. *Measure of Damages for Florida Common–Law Claims of Negligence and Breach of Fiduciary Duty*

■ Kane asserts that the recovery to which he is entitled for the negligence and breach of fiduciary duty claims is even greater than the $137,796 (plus interest) to which he is entitled under the state securities law. Here, Kane is mistaken.

Kane's claim to $186,197 is essentially a claim for lost profits. He contends that he should have been notified at least by the last week of May of the negative information on file at the Vancouver Stock Exchange. The last week of May is important only because it was the last week during which Kane could have sold his stock at a profit. After the first of June, the share price began a precipitous decline from which it never recovered. If Kane had sold his shares during the last week of May, his profit would have been $186,197.

Florida law is reluctant to award damages on the basis of such a speculative assertion as this. Kane wishes to recover anticipated profits based only on his claim that he would have sold the securities at the optimal time absent Raven's misrepresentations. Such speculative lost profits damages are not recoverable. *Himes v. Brown & Co. Securities*, 518 So.2d 937, 939 (Fla.Dist.Ct.App.1987).

### CONCLUSION

The District Court award to Kane of $137,797 plus interest is AFFIRMED.