**RESOLUTION TRUST CORPORATION, as Receiver for Commonwealth Federal Savings & Loan Association, and Resolution Trust Corporation, Plaintiff,**

v.

**STROOCK & STROOCK & LAVAN and Richard S. Savitt, Defendants.**

No. 92–7181–CIV.

United States District Court, S.D. Florida.

May 25, 1994.

---

**6.** The last inspection took place on January 3, 1990. Thus, the permit for Building One expired on or about April 3, 1990.

William F. Duker, Richard L. Crisona, Duker & Barrett, New York City, Karen C. Dyer of counsel, Duker & Barrett, Orlando, FL, Stephen N. Zack, Zack Hanzman Ponce Tucker Korge & Gillespie, Miami, FL, for plaintiff.

Robert D. McLean, Peter Keisler, David L. Lawson, Jacqueline Gerson, Sidley & Austin, Washington, DC, Alan G. Greer, Diane W. Katzen, Floyd Pearson Richman Greer Weil Brumbaugh & Russomanno, Miami, FL, for defendants.

## AMENDED ORDER

GONZALEZ, District Judge.

**THIS CAUSE** has come before the Court upon Defendants' Motion for Summary Judgment. Defendants' assert, *inter alia*, that even under the facts as put forth by Plaintiff, Plaintiff can prove no legally compensable damages in this case.

The Motion for Summary Judgment was fully briefed by the parties, and the Court held oral argument on the motion. The Court then set a Rule 43(e) hearing to focus specifically on the issue of damages. The issue was again briefed by the parties in their respective memoranda submitted prior to and in conjunction with the hearing. At the two-day hearing, oral testimony was taken from the respective experts who would be

testifying at trial as to the issue of damages. After the oral testimony by the experts, closing arguments on the issue were made.

The standards governing summary judgment have become axiomatic. Summary judgment may be granted when there are "... no genuine issues as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Tippens v. Celotex Corp.,* 805 F.2d 949, 952–954 (11th Cir.1986); *See also* C. Wright, A. Miller and M. Kane, Federal Practice and Procedure, § 2725 at 75 (1983). The evidence must be viewed in the light most favorable to the non-moving party. *Tippens,* 805 F.2d at 892, *Sweat v. Miller,* 708 F.2d 655, 656–657 (11th Cir.1983). However, "[i]n order to avoid the grant of summary judgment, a party must demonstrate both the existence of a material fact and a genuine issue as to that material fact." *Kennett–Murray Corp. v. Bone,* 622 F.2d 887, 892 (5th Cir.1980). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading...." Fed.R.Civ.P. 56(e).

The complaint in this case comprises claims brought by the RESOLUTION TRUST CORPORATION ("RTC") against the law firm STROOCK & STROOCK & LAVAN ("STROOCK") and former STROOCK partner RICHARD S. SAVITT ("SAVITT"). Counts I–IV are brought by the RTC in its Receivership capacity and are four common law causes of action brought against Defendants in connection with the legal services provided by Defendants to the failed COMMONWEALTH FEDERAL SAVINGS & LOAN ASSOCIATION ("COMMONWEALTH"). Essentially, these claims are for legal malpractice and center on Defendants' alleged failure to advise COMMONWEALTH that certain junk bond purchases were illegal under a Florida statute. Count V is a common law claim of negligent misrepresentation brought by the RTC in its corporate capacity. Here, the RTC claims Defendants misrepresented the nature and existence of certain COMMONWEALTH holdings—to wit, the illegal junk bond purchases—in connection with the preparation by Defendants of documents relating to a November 15, 1985 public offering of subordinated debt by COMMONWEALTH.

As summarized by Plaintiff, "the RTC suffered two separate types of losses. The first component of plaintiff's losses is the more than $35 [footnote omitted] million in damages resulting from Commonwealth's junk bond investments. The second are the damages arising out of the sub debt offering." Revised Joint Pretrial Stipulation ("Plaintiff's Statement of the Case") at 14. For the reasons stated below, the Court finds that each theory of damages fails as a matter of law.

### JUNK BOND DAMAGES

■ The theory of these damages is essentially this: the Defendants' negligent actions caused COMMONWEALTH to purchase the subject junk bonds and the proximate, foreseeable result of this purchase was the loss that COMMONWEALTH suffered on these junk bonds. The problem with the theory is that COMMONWEALTH, in an absolute sense, actually made money on the junk bonds. That is, if the purchase price of the junk bonds is subtracted from the sum of the selling price of the junk bonds and the interest on the junk bonds paid to COMMONWEALTH, the difference is a "profit" of roughly $20 million. The RTC argues that the return on the junk bonds actually represents a loss because, but for Defendants' negligence, COMMONWEALTH would have invested in something that would have produced returns much greater than the returns produced by the junk bonds. The RTC attempted to establish this through the testimony and exhibits of their expert witness on this matter, Professor David Teece.

Professor Teece constructed a model for measuring the damages COMMONWEALTH suffered as a result of the junk bond purchases. The model is based on comparing the returns of the junk bonds with the returns of the "most likely" alternative investments—ie. what COMMONWEALTH would have invested in. In Professor Teece's words:

one simply asks the question, well if Commonwealth hadn't invested in these particular instruments, what is [sic] the most likely instruments that they would have invested in, and what is [sic] the returns that they would have gotten from that alternative portfolio as compared to the portfolio of junk.

See Hearing Transcript at 14. The alternative investment instruments that Professor Teece chose were BBB bonds because these bonds were, according to Professor Teece, "the closest substitute to junk" that COMMONWEALTH could have legally purchased. See Hearing Transcript at 37. The returns of the alternative portfolio were not based on the hypothetical purchases of individual BBB bonds. Rather, the alternative returns were calculated by substituting for each junk bond actually purchased and sold by COMMONWEALTH the purchase and sale of a theoretical BBB bond that had the qualities of the theoretical "average" BBB bond as determined by the yearly average interest earned on Moody's BBB bonds.

■ The damages sought here are a claim for lost profits. See generally Kane v. Shearson Lehman Hutton, Inc., 916 F.2d 643, 647 (11th Cir.1990) (characterizing damages based on alternative investment scenario as a claim for lost profits).[1] Thus, the existence of recoverable damages associated with the junk bond purchases must be determined under Florida law on lost profits.

■ The Florida Supreme Court, in W.W. Gay Mech. Contr. v. Wharfside Two, 545

So.2d 1348 (Fla.1989), stated that in order to recover lost profits: "The party must prove that 1) the defendant's action caused the damage and 2) there is some standard by which the amount of damages may be adequately determined." Id. at 1351.[2] The Court finds that there has been no set of facts put forth by the plaintiff which could meet either of these often interrelated requirements.

That there is a fatal problem with causation is reflected in Messer v. E.F. Hutton & Co., 833 F.2d 909 (11th Cir.1987).[3] In Messer an investor sought lost profits as damages for unauthorized trades. The plaintiff claimed that but for the defendants' actions he would have followed a preexisting, programmed investment plan devised by his broker. Therefore, he claimed, damages could easily be measured because of his obvious alternative position. "The problem with Messer's proof of damages, however, is not the measurement of damages but their causation." Id. at 923. The court found that there was "little reason to believe that Messer would have followed [the] investment plan." Id. at 923. "Since Messer cannot show with reasonable certainty that he would have followed [the] investment plan, he cannot prove that the April 29 unauthorized trade proximately resulted in lost future profits." Id. at 923. In the case at hand, the Court finds the record simply devoid of any evidence to show—much less, create "reasonable certainty"—that COMMONWEALTH would have bought BBB bonds (or any other

1. The RTC initially argued in its Memorandum in Opposition to Defendants' Motion for Summary Judgment that the claim was not for "lost profits", but was for "opportunity costs". The Court has found no basis for such a distinction under Florida law. Nor was Professor Teece able to draw any such distinction. See Hearing Transcript at 90.

2. The Court notes that the circumstances to which this standard was applied in W.W. Gay are profoundly disparate from those found here. In W.W. Gay the "alternate" position of the plaintiff hotel was reasonably calculable based on preexisting occupancy projections. The hotel's revenues were compared to what the same hotel's revenues would have been but for the presence of a foul smell. Thus, there was a single exogenous variable, making the analysis far less susceptible

to minute perturbations. Here, by contrast, there is a universe of alternate positions with few constants. Such alternative analysis in the investment context entails an inquiry into what the plaintiff would have done, with the slightest deviation in the particular hypothesized decision producing substantially different results.

3. It should be noted that this case was decided before the Florida Supreme Court stated in W.W. Gay that a "track record" was not a requirement for a business to recover lost profits. Accordingly, the Court does not draw from any reasoning in Messer premised on the existence of such a requirement. Absence of a track record is not the problem with the RTC's claims; rather, to the extent there is a track record, that record does not support the proffered alternate investment decisions or the hypothesized results.

single investment) but for the alleged negligence of the defendants. Moreover, this is not a case where virtually all of the alternative investments would have done better than the junk bonds, which would make it simply a case of how much more money COMMONWEALTH would have made. Rather, no doubt, many of the alternative investments would have fared far worse (as COMMONWEALTH found out in other transactions). Thus, even if the problem of measuring damages could be overcome, the level of uncertainty as to causation would prevent recovery under Florida law.

In *Kane*, the defendants negligently failed to provide an investor with negative information on certain stock. The plaintiff sought lost profits, claiming he would have sold the stock before its precipitous decline in value but for the defendants' negligent failure to provide him with the negative information. Lost profits would be calculated based upon the selling price of the stock during the period in which the plaintiff should have received the negative information. The Eleventh Circuit concluded:

> Florida law is reluctant to award damages on the basis of such a speculative assertion as this. Kane wishes to recover anticipated profits based only on his claim that he would have sold the securities at the optimal time absent [the] misrepresentations. Such speculative lost profits damages are not recoverable. *Himes v. Brown & Co. Securities*, 518 So.2d 937, 939 (Fla. 3rd DCA 1987).

*Id.* at 647.

In *Himes*, the plaintiff claimed "to have suffered damages as a result of two missed opportunities ..." involving the purchase of securities. *Himes* at 938.

> In Florida, unless the fact-finder is presented with evidence which will enable it to determine damages for lost profits with a reasonable degree of certainty, rather than by means of speculation and conjecture, the claimant may not recover such dam-

ages. Since Himes did not suffer any out-of-pocket damages, the trial court properly denied him recovery because his claimed damages for lost profits are speculative. His only claim is that Brown's actions deprived him of anticipated profits because he would have sold (or purchased, in the case of the short sale) the securities at the optimal time and earned a profit.... Himes did not present any evidence which would prove that he would have completed the time-sensitive transactions at precisely the correct time and we doubt whether he could have offered such proof. The evidence strongly supports Brown's position that Himes's only possible damages are speculative "lost profits" damages and are therefore not recoverable.

*Id.* at 938–39 (citation omitted).

■ Thus, even in an alternative world where the investment option is known, time-sensitivity of transactions alone can inject enough uncertainty into the measurement of damages to render lost profits unrecoverable. Obviously, this factor is greatly compounded where the alternative investment choice is not known. While difficulty in determining the precise amount of damages will not prevent recovery, there must be "such certainty as satisfies the mind of a prudent and impartial person." *Twyman v. Roell*, 123 Fla. 2, 166 So. 215 (1936). Applying this standard to the evidence put forth by the RTC results in a conclusion that Defendants are entitled to a judgment as a matter of law on this issue because damages, if any, simply cannot be "adequately determined." *W.W. Gay* at 1351. Thus, the RTC's theory of damages meets neither of the requirements for recovering lost profits under Florida law.

■ The RTC also puts forth an apparently eleventh-hour alternative theory that Section 212(*l*) of FIRREA[4] should be interpreted to mean that only the difference in principals should be measured and that the return in the form of interest should not be taken into account in determining whether there

---

**4.** 12 U.S.C. § 1821(*l* ). This section on damages states:

> In any proceeding related to any claim against an insured depository institution's ... attorney ..., recoverable damages determined to result

from the improvident or otherwise improper use or investment of any insured depository institution's assets shall include principal losses and appropriate interest.

was a "loss". The Court simply has found no support for this seemingly irrational interpretation in either the legislative history or the case law.[5] As Defendants point out, this interpretation would constitute a major intrusion into a traditional area of common law—not something to be done lightly. Consequently, the Court will give the language the reading that also happens to make the most sense, which is that the statute does not preclude the consideration of interest on a high-interest bond.

### SUB DEBT DAMAGES

■ The theory of these damages is that Defendants' negligence caused the sub debt offering to go forward, which increased COMMONWEALTH's regulatory capital by $20 million, which "allowed Commonwealth to expand its assets by approximately $600 million. In expanding its operations, Commonwealth suffered an increased level of losses which it would not have incurred had it [not been] for the increased growth funded with the offering proceeds." Revised Joint Pretrial Stipulation ("Plaintiff's Statement of the Case") at 14. Or, as Defendants characterize it:

> ... but for Stroock's alleged misrepresentation, Commonwealth's subordinated debt application would not have been approved by regulators; but for that approval Commonwealth would not have increased its capital and would never have been able to raise any capital through any other means; but for the additional capital, Commonwealth would not have taken in additional deposits; but for additional deposit funds, Commonwealth would not have entered into additional loans, joint ventures and other investments; but for these additional transactions ... Commonwealth would have lost less; but for these additional losses, Commonwealth would have paid more of the claims of its insured depositors when it ultimately failed; and but for this shortfall, the [FSLIC] would have paid less.

Defendants' Motion to Strike Plaintiff's Additional Claims at 12. The RTC's theory is embodied in a model created by Professor Dwight M. Jaffee, the RTC's expert witness on this matter. The model purports to show how Defendants' alleged negligence lead to COMMONWEALTH's losing more money and to calculate what this amount is.

■ "Negligence is the legal cause of damage if it directly and in natural and continuous sequence produces or contributes substantially to producing such damage, so that it can reasonably be said that, but for the negligence, the damage would not have occurred." Fla.Std.Jury Instr. (Civil) 5.1a (emphasis added). *See also Pope v. Pinkerton–Hays Lumber Co.,* 120 So.2d 227 (1st D.C.A.Fla.1960), *cert. den.* 127 So.2d 441. Thus, the existence of a simple "but for" relationship between the claimed negligence and the injury will not support the finding of legal causation. As Justice Scalia stated in *Holmes v. Securities Investor Protection Corp.,* —— U.S. ——, ——, 112 S.Ct. 1311, 1327, 117 L.Ed.2d 532 (1992) (Scalia, J., concurring in judgment): " '[F]or want of a nail, a kingdom was lost' is a commentary on fate, not the statement of a major cause of action against a blacksmith." There must be proximate cause. And if the absence of this proximate cause is clear enough, the matter becomes a question of law.

This proposition was recently reaffirmed by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In a case addressing how courts should handle expert testimony, the Supreme Court stated: "[I]n the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to ... grant summary judgment." *Id.* at ——, 113 S.Ct. at 2798. In a case cited by the Supreme Court, *Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349, (6th Cir.1992), the appellate court upheld a grant of summary judgment where the district court "concluded that the evidence adduced on summary judgment was insufficient to allow a rational jury to find that [the drug]

---

5. In support of this interpretation, the RTC asserted that "the law is an ass." The Court will not add to this supposition by adopting the RTC's interpretation of this statute.

caused the [plaintiff's damages]." *Id.* at 1349–50 (emphasis added). *See also, e.g., Holmes, supra* (where district court granted summary judgment for lack of proximate cause, Supreme Court agreed that there was no proximate cause); *Vukovich v. Leo,* 447 So.2d 1012 (Fla. 3d DCA 1984).

Defendants have cited a number of cases in which recovery on such a string of "but for"s was foreclosed by the court. In *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57 (2nd Cir.1985), a trustee sought damages from corporate counsel, claiming that the injured corporation "would have been unable to acquire the 'large amounts of money' necessary to 'perpetrate and maintain the fraud'" without the defendant's alleged misfeasance. *Id.* at 62 (citation omitted). The District Court dismissed the case because the damage theory amounted to simple "but for" causation which is insufficient to sustain recovery. The Circuit Court held that: "The District Court was correct in concluding, as a matter of law, that any injury suffered by [the corporation] as a result of the alleged fraud was not proximately caused by the actions of [the law firm]." *Id.* at 63 (emphasis added) (footnote omitted). *See also Rochelle v. Marine Midland Grace Trust Co.,* 535 F.2d 523, 529–30 (9th Cir.1976) (noting lack of causation regarding later "frittering away" of funds); *Johnson v. Chilcott,* 590 F.Supp. 204, 209 (D.Colo.1984) ("The 'but for' causation chain fails as a matter of law to establish a proximate causal link ...").

The RTC has attempted to distinguish these cases on the grounds that in these cases the alleged negligence was vis-a-vis the investor rather than the injured institution. That is, misrepresentations to investors allowed the raising of additional funds. In the case at hand, the RTC argues, the alleged negligence was directly vis-a-vis the allegedly injured institution.

> Here, there is a direct causal connection between the challenged conduct and the harm. Stroock failed to fulfill its professional obligations to Commonwealth—the issuer. As a result, Commonwealth—the issuer—was harmed. Stroock proximately caused the subordinated debt offering-related damages.

Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Strike at 15. The RTC's conclusion, however, does not follow from its premise. This is not a question of privity. A direct relationship between the parties does not entail a direct relationship between the actions of one party and the damages eventually suffered by the other party. The problem with the theory of causation in those other cases was not to whom the misrepresentations were made, but rather the attenuated "but for" chain upon which the theory of causation rested. Whether funds were raised through misrepresentations to investors, or to the issuer, or to state regulators is not an operative fact in this Court's analysis of the RTC's theory of legal causation. The decision in *Bloor* was based on the rather fundamental reasoning regarding the existence of causation. Given the almost universal requirement of proximate cause, there is no reason such logic should not be instructive with regard to this case.

Here, even simple "but for" causation is speculative. The chain of "but for"s tying the defendants' actions to the plaintiff's injury is one in which the failure of any one link breaks all causal connection. Thus, not only "proximate cause" is implicated by the extended nature of the RTC's theory of causation with respect to the sub debt damages. For example, one of the assumptions upon which Professor Jaffee's model is based is that had Defendants properly disclosed that COMMONWEALTH was holding the subject junk bonds, state regulators would not have allowed the sub debt offering to go forward. However, there has been no evidence presented to adequately support this assumption. Similarly, the model also assumes that COMMONWEALTH would not have been able to raise any other capital or otherwise been able to realize any additional growth at all. Again, the evidence presented—and with the Court mindful of allowing every reasonable inference in Plaintiff's favor—does not support either of these conclusions.[6]

---

**6.** The Court is reminded of the attempt to keep the dinosaurs from breeding in *Jurassic Park.* All dinosaurs were genetically structured to be of the same sex. And yet, "life found a way."

The fact that damages occurred must be shown with at least reasonable certainty. Whether the individual "but for" assumptions could be accepted by a reasonable person is one question. Whether the entire scenario could be accepted by a reasonable person as being reasonably certain is another question.[7]

Finally, the problem of measuring damages is also present with the sub debt damages.[8] This is not a case where substantial damages have been proved, and it is just a matter of figuring out the precise amount. Consequently, the RTC cannot seek refuge in the line of case holding that inability to show the precise damage amount does not preclude recovery. *E.g., McCall v. Sherbill*, 68 So.2d 362 (Fla.1953). Indeed, after extensive briefing and two days of expert testimony on this issue, the Court concludes that there is no basis for predicting what COMMONWEALTH's eventual financial destiny would have been but for the Defendants' alleged negligence.

## CONCLUSION

█ As a general matter, this Court is properly reluctant to grant summary judgment on the basis of issues involving causation and damages. However, having thoroughly explored what would have been presented to the jury, the Court cannot help but conclude that the degree to which the RTC's damage theories rest on speculation raises the dispositive issues to the level of being questions of law. It is also quite clear that in such situations, the issues need not, and should not, go to the jury. *E.g., Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1361 (6th Cir.1992) ("... a jury should not be asked to speculate on the issue of causation"). Similar damage theories have also been disposed of as matters of law. *E.g., Bloor, supra.* The Court has accepted all facts as put forth by Plaintiff and allowed for all reasonable inferences that could be drawn from those facts. However, this motion for summary judgment is not about disputed facts; it is about the application of legal standards.

The RTC's claims regarding the junk bond investments are claims for lost profits. Because there is no basis for concluding what COMMONWEALTH would have done as an alternative to the junk bond investments, there is no basis for predicting whether any such alternative investment would have produced greater or lesser returns than the $20 million the junk bonds produced. Consequently, there is no basis for determining that Defendants caused any damage. Additionally, and somewhat redundantly in this context, there is no "standard by which the amount of damages [could] be adequately determined." *W.W. Gay* at 1351. The RTC's own expert, Professor Teece, could only characterize his model, upon which the RTC relied to show that COMMONWEALTH was damaged, as the "least speculative".[9] Frankly, the Court thinks that it's anyone's guess what (and when) COMMONWEALTH would have done had it not invested in junk bonds. Of course, the variables do not stop there—when would it have bought, when would it have sold, what particular security or real estate deal would it have invested in, would it have rolled proceeds over, etc. Regardless of which guess is best, any such guess would be the type of conjecture and speculation which cannot support recovery of damages under Florida law.

Similarly, everything about COMMONWEALTH's history suggest that it would have "found a way" to grow.

7. By way of illustration, even if independent "but for"s A, B, C, D, and E each have a 70% likelihood of being correct, there is still only a 17% chance that A "caused" E.

8. Although often interrelated, proof that damages did occur and proof of the amount of damages are both required.

9. "And it fundamentally comes back to what I said before about what is the closest thing, the least speculative way that I can figure out with respect to how to determine the alternative investment, is to ask the question, well, what other corporate bonds, besides junk—because junk is a form of corporate bond—would have a high yield, and yet be on the right side of the law." Hearing Transcript at 43. In response to this, Defendants offered a chart showing twenty-four different type of investment options in which COMMONWEALTH could have invested (e.g. real estate) and pointed out that COMMONWEALTH had never been, either before or after the State instructed COMMONWEALTH to sell the junk bonds, a regular purchaser of BBBs.

This same reliance on speculation also undermines any claim for damages associated with the sub debt offering. Neither the "fact" that damages occurred nor the amount of any such damages can be shown with reasonable certainty. There is simply no means of reaching these types of conclusions in this case without resorting to conjecture. Additionally, Plaintiff has failed to put forth any evidence that would support a finding of proximate cause with respect to the eventual financial position of COMMONWEALTH when it entered receivership, some four years after Defendants' alleged negligence.

Accordingly, having reviewed the extensive record in this matter, and having heard the oral argument of counsel and the oral testimony of the respective expert witnesses, and for the reasons more fully developed by Defendants, it is hereby:

**ORDERED AND ADJUDGED** that the Defendants' Motion for Summary Judgment is **GRANTED.** Defendants are directed to file a form of judgment for entry in this cause within fifteen (15) days of the date of this Order. It is further hereby:

**ORDERED AND ADJUDGED** that all other pending motions are hereby **DENIED** as moot.

**DONE AND ORDERED.**